UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIONAMERICA INSURANCE CO., LIMITED, Successor-in-interest to ST. PAUL REINSURANCE,<br><br>　　　　Plaintiff(s),<br><br>　　v.<br><br>THE FORT MILLER GROUP, INC., THE FORT MILLER CO. and BEECHE SYSTEMS CORP.,<br>　　　　Defendant(s). | No. C05-1912 BZ<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION** |

Plaintiff Unionamerica Insurance Company ("Unionamerica") has moved for summary adjudication on its first and second causes of action, on the basis that it is entitled to rescind the Commercial General Liability Gap Insurance policies ("CGL gap policies") it issued in 2000 and 2001 to defendants The Fort Miller Group, Inc. ("Fort Miller") and its subsidiary Beeche Systems Corp. ("Beeche").[1]

---

[1] All parties have consented to my jurisdiction for all proceedings including entry of final judgment, pursuant to 28 U.S.C. § 636(c).

1

1  Unionamerica contends that Fort Miller failed to disclose in
2  its CGL gap policy applications the nature of its business as
3  it relates to the design and manufacture of custom
4  "engineered access systems" and misrepresented the value of
5  the products Beeche manufactured.  Defendants contend that
6  they did not fail to disclose material information in
7  applying for the CGL gap policies, and alternatively, that
8  any misrepresentations or omissions in the CGL gap policy
9  applications were not material to Unionamerica's decision to
10 underwrite the policies.  For the reasons set forth below,
11 Unionamerica's motion is **DENIED**.
12     Viewing the record in the light most favorable to Fort
13 Miller and drawing all reasonable inferences therefrom, the
14 factual background to this case is as follows:
15     Fort Miller is the parent of eight subsidiary companies,
16 including Beeche.  Before acquiring Beeche in 1998, Fort
17 Miller manufactured and sold pre-cast concrete products and
18 sold fencing and gates.  Beeche manufactures various
19 components for "access platforms" that allow construction and
20 remediation workers to access high structures, such as office
21 buildings and bridges.  Beeche also sells entire access
22 platform systems, which are comprised of its components and
23 components manufactured by other companies, that it then
24 ships to its buyers who generally assemble the system on
25 site.
26     At some point after it acquired Beeche, Fort Miller,
27 assisted by an insurance broker from Associates of Glens
28 Falls, Inc. ("AGF"), sought to purchase a gap insurance

2

policy to cover any exclusions in its comprehensive general liability policy.

In early March 1999, Barbara Marshall ("Marshall"), a broker with AGF, prepared a preliminary, unsigned application for a CGL gap policy on behalf of Fort Miller and submitted it to U.S. Risk Underwriters, Inc. ("U.S. Risk").  U.S. Risk placed gap insurance policies with London-based companies, such as St. Paul Reinsurance Co., Unionamerica's predecessor-in-interest.[2]

On March 8, 1999, Marshall forwarded the unsigned application to Sandy Hoffman ("Hoffman"), an underwriter for U.S. Risk who handled the Fort Miller account in 1999 and 2000.  The cover letter informed Hoffman that the unsigned application was Fort Miller's "first quote of this type for this coverage" and requested that Hoffman review the application and advise AGF if there was any additional information that Fort Miller needed to submit.  The unsigned application identified Beeche as one of the entities that Fort Miller sought to have added as a named insured under the CGL gap policy and described the nature of Fort Miller's business as "manufacturing, construction and service industries."  Marshall sent Hoffman brochures describing Fort Miller's products.  None of the brochures found in U.S.

---

[2] During argument, Unionamerica conceded that U.S. Risk was acting as Unionamerica's agent.  Because U.S. Risk acted as Unionamerica's agent, any knowledge that U.S. Risk and its underwriters had regarding the applications for the CGL gap policy is presumed to be knowledge that Unionamerica also had.  See Culley v. New York Life Ins. Co., 27 Cal.2d 187, 192 (1945) (citing Vanciel v. Kumle, 26 Cal.2d 732, 734 (1945)).

Risk's files describe Beeche's products.

Hoffman responded in writing on March 11, 1999. The only questions she asked were what the average and the largest values of the products that Fort Miller manufactures.[3] That same day, Marshall answered that the average value was less than $1,000 and that the largest value was $100,000.

Hoffman also went online to learn more about Fort Miller's products. In March 1999, she telephoned Marshall and told her that she was experiencing difficulty in locating Fort Miller's products on its website.[4] Marshall informed Hoffman that all of Fort Miller's subsidiaries had their own websites, which listed their respective products, and that each of these websites could be accessed via the main Fort Miller website.

On April 1, 1999, U.S. Risk transmitted a premium quote for CGL gap policy coverage to AGF. In May 1999, after making several changes to the original draft application, including the addition of the term "engineered access" to the description of its business, Fort Miller executed the application. The executed application was forwarded to U.S. Risk on or about June 8, 1999; however, coverage under the

---

[3] The CGL gap policy application contains these same questions; however, the original unsigned application left the answers to these two questions blank.

[4] Unionamerica's hearsay objection to Marshall's testimony about her conversation with Hoffman is **OVERRULED** pursuant to FRE 801(2)(D). Unionamerica's objection that Marshall's testimony violates the parole evidence rule is **OVERRULED.** Her testimony is admissible as evidence that any omission was not material to Hoffman's decision to underwrite the policy since she had access to information about Beeche.

4

policy was for April 9, 1999 through April 9, 2000.

On March 17, 2000, before the gap policy was scheduled to expire, AGF sent a letter to U.S. Risk requesting renewal. The letter asked whether U.S. Risk needed any additional information from Fort Miller to quote renewal pricing. On March 28, 2000, Hoffman sent a memo to AGF attaching a renewal quote based on the information provided by AGF in 1999. The CGL gap policy was renewed for coverage through April 2001, with coverage to be provided by St. Paul Reinsurance Company Limited, Unionamerica's successor-in-interest. Unlike the signed 1999 CGL gap policy application, the signed version of the 2000 CGL gap policy application contained no reference to "engineered access."

In January 2001, Fort Miller, again using AGF as its broker, requested a third renewal. Hoffman no longer worked for U.S. Risk, and Betty Prah ("Prah"), Hoffman's former supervisor, became the underwriter for the third policy issued to Fort Miller. In the 2001 application, Fort Miller added the term "access platforms" to the list of products manufactured by Fort Miller and its subsidiaries; the remainder of the application was identical to those submitted in the previous two years. The policy was renewed in 2001, a claim ensued under the 2001 policy, and Unionamerica filed an action for rescission of the 2000 and 2001 GCL gap policies.

The papers filed in connection with this motion stand about 3 feet high and exemplify much of what can go wrong
///
///

with summary judgment motion practice.[5]  Stripped to its essentials, the motion boils down to two issues: 1) whether Fort Miller concealed or misrepresented the value of the products that it manufactured in the applications[6]; 2) whether Fort Miller's failed to disclose "all it knew" about the nature of Beeche's business by failing to list all of Beeche's products and failing to attach Beeche's product brochures and, if so, whether that failure was material such that it entitles Unionamerica to rescission as a matter of law.

In a diversity action that involves interpretation of an insurance contract, California law governs.  Conestoga Servs. Corp. v. Executive Risk Indem., Inc., 312 F.3d 976, 981 (9th Cir. 2002).  In California, a material misrepresentation or

---

[5] The parties did not follow the Court's order requesting the filing a joint statement of undisputed facts. Instead, both parties have filed separate statements of undisputed facts, which are accompanied by numerous requests for judicial notice, motions to strike, and objections to facts that are of no material significance.  Rather than rule on each individual objection, motion to strike, and request for judicial notice, I will simply state that I am satisfied that the few material facts set forth in this Order are based on admissible evidence.

[6] In its reply brief, Unionamerica alleged an alternative ground for rescission based on Fort Miller's misrepresentation of the premiums Fort Miller paid for its CGL coverage.  Because this argument was neither raised by Unionamerica in its opening brief nor raised by Fort Miller in its opposition brief, I have not taken it into consideration as an alternative theory for rescission, and have only considered it for rebuttal purposes.  See Glenn K. Jackson Inc. v. Roe, 273 F.3d 1192, 1201 (9th Cir. 2001) (stating that the district court has discretion to consider an issue raised for the first time in a reply brief); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (stating that the district court "need not consider arguments raised for the first time in a reply brief.").

concealment in an insurance application, whether intentional or unintentional, entitles the insurer to rescind the insurance policy *ab initio*.[7]  O'Riordan v. Federal Kemper Life Assurance, 36 Cal.4th 281, 286-87 (2005); Barrera v. State Farm Mut. Automobile Ins. Co., 71 Cal.2d 659, 665, fn.4 (1969).  This rule has been codified in the California Insurance Code.[8]  *See* West Coast Life Ins. Co. v. Ward, 132 Cal.App.4th 181, 187 (2005) (citing Imperial Casualty & Indemnity Co. v. Sogomonian, 198 Cal.App.3d 169, 179-180 (1988)).  Under California Insurance Code § 334, "materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party

---

[7]  Fort Miller erroneously argues that the clause that appears at the end of the CGL policy applications, which states in relevant part that "[a]ny person who knowingly and with intent to defraud any insurance company or other person files an application for insurance . . . for the purpose of misleading . . . commits a fraudulent insurance act . . .", modifies the normal rule and permits rescission only where concealment or misrepresentations are intentional.  In support of its position, Fort Miller cites Clarendon Nat'l Ins. Co. v. Ins. Co. of the West, 442 F.Supp.2d 914, 928 (E.D. Cal. 2006).  The clause that Clarendon included in its coverage application is distinguishable from the clause Unionamerica included, in part because the clause in Clarendon specifically stated that the coverage form would be "void" in the event of an intentional concealment or misrepresentation of a material fact.  Here, Unionamerica does not speak of voiding the application or policy, but instead informs the insured that it will be subject to criminal penalties for fraudulent statements.  I therefore find Clarendon to be factually distinguishable.  A California court has found "Clarendon's rescission analysis . . . unpersuasive . . . .".  LA Sound USA, INC. v. Paul Fire & Marine Ins. Co., 156 Cal.App.4th 1259, 1270 n.4 (2007)

[8]  Thus, under California Insurance Code § 331, "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance."  Concealment is defined in § 330 as "[n]eglect to communicate that which a party knows, and ought to communicate."

7

to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." The test is subjective in the sense that "the critical question is the effect truthful answers would have had on [the particular insurer], not on some 'average reasonable' insurer." Sogomonian, 198 Cal.App.3d 169 at 181. Materiality may be determined as a matter of law where no reasonable person can disagree as to the materiality of the misrepresentation. *See* Cummings v. Fire Ins. Exch., 202 Cal.App.3d 1407 (1988). "The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." Thompson v. Occidental Ins. Co., 9 Cal.3d 904 (1973) (citations omitted).

Summary judgment of rescission may be properly granted for the insurer where the only reasonable inference to be drawn from the evidence presented is that "the false negative answers and omissions of [the applicant] were material to [the insurer's] decision to provide insurance coverage." Sogomonian, 198 Cal.App.3d at 182; Lundardi v. Great-West Life Assurance Co., 37 Cal.App.4th 807, 827 (1993); Wilson v. Western National Life Ins. Co., 235 Cal.App.3d 981, 995-96 (1991). The burden of proof is on the insurer to establish concealment or misrepresentation. Thompson, 9 Cal.3d at 915; *see also* Casey by & Through Casey v. Old Line Life Ins. Co. of Am., 996 F.Supp. 939, 944 (N.D. Cal. 1998).

///
///

### *Fort Miller's Alleged Misrepresentation*
### *of the Value of Its Products*

Questions 4 and 5 of the CGL gap policy applications asked for the highest value of any product that Fort Miller "manufactured" and the average value of the products that Fort Miller "manufactured". Fort Miller answered $100,000 and "less than $1,000", respectively.[9] Unionamerica argues that there "is no question" that Fort Miller misrepresented both of these values, and contends that the values are in fact much higher.

Viewing the evidence and all reasonable inferences in the light most favorable to Fort Miller, I cannot say as a matter of law that Fort Miller misrepresented its answers to the policy application questions. The policy applications inquired as to the highest value of a product that Fort Miller "manufactured", not the highest value of a product that it "sold."[10] Fort Miller has offered evidence that while it "manufactures" many of the component parts for the access

---

[9] These same questions were asked as questions 5 and 6 in the 2001 application. In the 2001 application, Fort Miller's responses were identical to those in the 1999 and 2000 applications.

[10] The applications ask the following four questions in sequence: "What are your estimated product sales for the next 12 months; What is the highest value of a product that you manufacture and describe that product; What is the average value of a product that you manufacture; During the last five years, do you know of a product that you manufactured or sold which was damaged or destroyed as a result of a condition within the product itself?" Fort Miller asserts and supports with evidence, that the use of the disjunctive in the last question caused it to believe that the drafter of the application understood there to be a difference between the word "manufacture" and the word "sell."

systems that it assembles and sells, no component part that it "manufactures" has a maximum value that exceeds $100,000. While the systems that Beeche ultimately "sells" may have a retail value that exceeds $100,000, Fort Miller was not asked that question.

The term "manufacture" is not defined in the application. Fort Miller has submitted evidence that it interpreted "manufacture" to mean creating a product from raw materials and that it honestly, even conservatively, answered the questions as it understood them. On summary judgment, I cannot interpret a term, which Unionamerica itself chose not to define, against the insured where the insured's interpretation is not unreasonable. At most the questions in the application created an ambiguity, which must be construed against Unionamerica. *See* Ransom v. Penn Mut. Life Ins. Co., 43 Cal. 2d 420, 424 (1954) (provisions of an application clause that are susceptible to two different constructions must be resolved against the insurer); State Farm Mut. Ins. Co. V. Partridge, 10 Cal. 3d 94, 102 (1973)("all ambiguities in an insurance policy are construed against the insurer – draftsman.") Unionamerica's motion for summary adjudication that it is entitled to rescission because Fort Miller misrepresented the value of its products is **DENIED**.

### *Fort Miller's Alleged Failure to Provide Requested Information About Beeche's Products*

Unionamerica next argues that defendants had a duty to disclose "all facts within their knowledge" that may have been material to the risk, which included a duty to disclose

10

every one of Fort Miller's and its subsidiaries' products on the application as well as attach all product brochures and promotional materials. Unionamerica contends that Fort Miller's alleged failure to list Beeche's products or provide product brochures was a material concealment that entitles it to rescission as a matter of law.[11]

Neither side has cited any California case which analyzes the duties of the insurance company and the insured in the context of a commercial policy application, and the Court has found none. Instead, both sides cite to cases analyzing applications principally for health and life insurance. For example, Unionamerica cites repeatedly to Thompson v. Occidental Life Ins. Co., 9 Cal.3d 904, 915 (1973) for the proposition that Fort Miller had a duty to tell Unionamerica "all it knew" about its business. While this may make sense in the context of answering questions about one's medical history, it makes less sense in the context of Fort Miller answering questions about its eight subsidiary companies-- which make thousands of products-- especially when it is given two or three lines in which to do so in a form application that provides no additional instructions.[12]

---

[11] During argument, Fort Miller conceded that Beeche had product brochures in 1999.

[12] The only case cited to by Unionamerica outside of the context of life or health insurance is Imperial Casualty and Indemnity Co. v. Sogomonian, 198 Cal.App.3d 169 (1988) similarly is distinguishable. Sogomonian, dealt with misrepresentations by a homeowner who failed to disclose that his house had suffered damages in a landslide in his application for fire insurance.

11

Another line of health and life insurance cases holds that an insurer has a duty to investigate the accuracy of the information provided by the insured, if it knows or should know the information is untrue.[13] Rutherford v. Prudential Ins. Co. of America, 234 Cal.App.2d 719, 735 (1965) (stating that if an insurer has facts that put it on notice that the application is incomplete or inaccurate in material respects, the insurer should conduct further inquiry); *see also* DiPasqua v. California Western States Life Ins. Co., 106 Cal.App.2d 281, 284-85 (1951) (insurer could not rescind policy it issued knowing that insured had falsely or negligently answered questions in the application).  In the context of a commercial insurance application such as this, I see some of the parties respective duties as follows: the insured has a duty to truthfully and completely answer the questions on the application; the insurer should ask questions to elicit information that it knows will be material to its underwriting decision; the insurer does not have a duty to investigate the accuracy of the insured's answers; the insurer does have a duty to ask the applicant to provide further information if it knows or should know that the application is inaccurate or incomplete.[14]

---

[13] In part, these cases rely on Section 336 of the Insurance Code which provides: "The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."

[14] In the context of automobile insurance, the law requires an insurer to undertake a reasonable investigation of the insured's insurability within a reasonable period of time

12

With these respective duties in mind, Fort Miller has offered evidence that even though it did not list Beeche's individual products on the policy applications, in the 1999 application it disclosed Beeche's business as "engineered access", and in the 2001 application, it added "access platforms" to the list of products.  If Unionamerica, knowing that Beeche was one of the Fort Miller companies it was being asked to insure, did not, as it contends, get any brochures or other information which sufficiently described Beeche's products so that it could make an informed underwriting decision, it could have asked for further information. Likewise, if Unionamerica did not understand the meaning of terms such as "engineered access" or "access platforms" that Fort Miller used, it could have asked.

In any event, there is evidence that Hoffman conducted an independent investigation into Fort Miller's products using the internet, and that during her investigation, she was directed by Marshall to the individual websites of Fort Miller's subsidiary companies.  It is reasonable to infer for summary judgment purposes that Hoffman was satisfied with what she learned about the nature of the risk that Fort Miller sought to insure since she decided to place the insurance.

---

from the acceptance of the application and the issuance of the policy, so as to protect third persons who may be injured by the insured.  See Barrera v. State Farm Mut. Auto Ins. Co., 71 Cal.2d 659, 678 (1969).  No California court has yet extended this line of reasoning to other types of insurance, such as the gap insurance policy at issue in this case, which also protect injured third parties.

13

Finally, Fort Miller submitted evidence that demonstrates that even if AGF failed to send Beeche brochures to U.S. Risk or sufficiently list Beeche's products on the CGL gap policy applications, there is a genuine issue of material fact concerning whether its failure to do so was material to Unionamerica's decision to underwrite the risk.

Fort Miller submitted evidence that U.S. Risk's underwriters' primary focus, when deciding whether to undertake an insurance risk, is on the value of the applicant's products, as opposed to the number of products manufactured or sold, or even each product's individual risk factor.[15]  For example, Fort Miller submitted portions of Prah's deposition testimony in which Prah was asked the following question: ". . . [s]o it doesn't really matter what the access platform is, provided it's not individually valued at more than $100,000?"  In response, Prah answered "[t]hat's correct."  (Miller Decl. Exh. G 125:23-25-126:1.)

As previously stated, summary judgment of rescission may be properly granted for the insurer where the only reasonable inference to be drawn from the evidence presented is that "the false negative answers and omissions of [the applicant] were material to [the insurer's] decision to provide insurance coverage." Sogomonian, 198 Cal.App.3d at 182.  In California, this requires the insurer to demonstrate that, had the true facts been disclosed, they would have caused the insurer's underwriters to reject the application or accept it

---

[15]  (See Miller Decl. Exh. G 90:21-91:5, 123:4-10, 131:5-24, 153:19-154:8.

1 only under different terms.  <u>Old Line Life Ins. Co. v.
2 Superior Court</u>, 229 Cal.App. 3d 1600, 1604-06 (1991).  In
3 light of the evidence offered by Fort Miller, there is an
4 issue to be tried as to the materiality of Fort Miller's
5 failure to list Beeche's products on the policy applications
6 or its failure to provide U.S. Risk with any Beeche product
7 brochures.

    For the foregoing reasons, Unionamerica's motion for summary adjudication is **DENIED**.

Dated: December 22, 2008

                               Bernard Zimmerman
                           United States Magistrate Judge

G:\BZALL\-BZCASES\UNIONAMERICA V. FORT MILLER\MSJv.9.BZ VERSION.wpd

15