UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE BERNARD ZIMMERMAN, MAGISTRATE

| | | |
|---|---|---|
| UNIONAMERICA INSURANCE COMPANY | ) | |
| LIMITED, successor-in-interest to | ) | |
| St. Paul Reinsurance Company | ) | |
| Limited, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 05-1912 BZ |
| | ) | |
| THE FORT MILLER GROUP, INC., THE | ) | |
| FORT MILLER COMPANY, INC. and | ) | |
| BEECHE SYSTEMS CORPORATION, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| | ) | December 17, 2008 |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**For Plaintiff:**    SELMAN BREITMAN LLP
11766 Wilshire Boulevard, Sixth Floor
Los Angeles, California  90025-6538
BY:  **MICHELLE R. PRESS, ESQUIRE**

**For Defendants:**    SQUIRE SANDERS
One Maritime Plaza, Suite 300
San Francisco, California  94111-3492
BY:  **ETHAN A. MILLER, ESQUIRE**
**DANIEL T. BALMAT, ESQUIRE**

**Reported By:**    *Katherine Powell Sullivan, CSR # 5812*
*Official Reporter - U.S. District Court*

P R O C E E D I N G S

DECEMBER 17, 2008                                    10:56 A.M.


**THE CLERK:**  Calling Civil action C 05-1912, Unionamerica Insurance Company versus The Fort Miller Group, et al.

Counsel, state your appearances.

**MS. PRESS:**  Good morning, Your Honor.

Michelle Press for the plaintiff and moving party, Unionamerica Insurance Company Limited.

**MR. MILLER:**  Good morning, Your Honor.

Ethan Miller for defendants, counterclaimants and responding party, Fort Miller and Beeche.

**MR. BALMAT:**  And Dan Balmat, also for defendants.

**THE COURT:**  Before we get into argument, let me raise two issues with you.  The first issue is why no joint statement of material fact was filed.

You all, at least apparently, knew of the obligation as set forth at my standing order.  And I didn't receive an explanation of why you didn't file one.

In fact, at one point I even thought about issuing an order to show cause.  And I finally got a filing from Ms. Press, I think in connection with her reply, in which she basically says, well, we tried, and they wouldn't agree.

When did you provide defendants with a list of

1  proposed undisputed facts?

2          **MS. PRESS:**  It was only three days before.  And it

3  was because --

4          **THE COURT:**  Is that the first time you thought you

5  might be filing a motion for summary judgment?

6          **MS. PRESS:**  We were still -- I don't know if the

7  Court recalls, but we were still receiving documents at that

8  point.  And we came in for a discovery hearing, and the

9  majority -- and I mentioned to the Court I was concerned about

10  complying with that.  And the majority of the facts that we

11  were submitting were -- are defendants' materials, their

12  advertising brochures and whatnot.

13          **THE COURT:**  Why couldn't you stipulate?  Maybe you

14  couldn't stipulate to all of them.

15          Because, look, I don't think you all understand what

16  you did.  When we got the motion, we don't know what to do with

17  it because we don't know what's going to be disputed and what's

18  not going to be disputed.

19          So, as a consequence, we don't really find out what's

20  going to be -- in fact, I told my clerk, Look, we're not going

21  to be able to work on this one for a while.

22          And so it's not really, then, until we get your

23  opposition that we can glean, in a very convoluted fashion, you

24  know, which are disputed and which are not disputed.

25          Then, of course, you file your separate statement,

1  and then I have to wait to find out what they're going to

2  dispute and what they're not going to dispute.

3          The vast majority of facts that appear on there --

4  there are hundreds of them -- are not in dispute.

5          So what you really have done, in a way, is foisted a

6  lot of your effort onto us.  So we're sitting there scrambling:

7  Is this disputed?  Is it not disputed?

8          And until we can really determine that, we really

9  can't rule on the motion for summary judgment.

10          **MR. MILLER:**  Your Honor --

11          **THE COURT:**  Yes.

12          **MR. MILLER:**  -- may we respond?

13          I was involved in this.  Mr. Balmat was more

14  involved.  I got an e-mail from Ms. Press on -- I believe it

15  was Saturday, before the Wednesday that her brief was due, with

16  an initial 69 --

17          **MR. BALMAT:**  16.

18          **MR. MILLER:**  I'm sorry, initial 16 proposed facts.

19  They then dribbled in as late as Monday or Tuesday.  In other

20  words, the very -- why don't you explain.

21          **MR. BALMAT:**  Yes.  There were the initial 16 proposed

22  stipulated facts that came in on Saturday night.  On Monday

23  they forwarded a revised list of 102 proposed facts.  And as

24  late as Tuesday afternoon -- Tuesday morning up until about

25  11 o'clock, they were forwarding exhibits relating to the

1    proposed facts.

2            And we said --

3            **THE COURT:**  Let me just stop you all because I don't

4    want to spend all your time.  I have an afternoon calendar.  I

5    have things I need to do over lunch, and so on.  I'm not going

6    to hold this against anybody.

7            I would -- in my mind, I think the plaintiff has

8    known for a long time that they were going to file a motion for

9    summary judgment.  And they've known for a long time what many

10   of the facts are going to be.  And I don't think the fact that

11   they were still getting discovery would have really altered,

12   you know, much of what I saw, much of which comes out of their

13   own files.

14           The reason I raise this point now is if this case

15   survives summary judgment, under my pretrial scheduling order

16   you have a lot of joint obligations.

17           I'm not going to sanction anybody now.  But I'm going

18   to tell you that if you all treat the pretrial preparation

19   portion of the order -- if this case survives -- the way you've

20   treated the portion directing how to make -- how to file

21   summary judgment motions, I'm just going to have to start

22   issuing sanctions.

23           I'm not going to allow you to place -- you know, to,

24   in effect, transfer what I believe to be your work to me.

25           This court does not -- we tried this procedure of the

1  separate statements and the counter statements, and so on, in

2  the '90s, and expressly revoked it.  We revoked the rule that

3  provided it because of our experiences.  It's very frustrating

4  for the court.

5          And you can't simply, by disobeying court orders,

6  make the Court do what the Court doesn't want to do.  So I'm

7  just telling you that it's got to stop.

8          **MR. MILLER:**  Your Honor --

9          **THE COURT:**  Yes, Mr. Miller.

10         **MR. MILLER:**  We would have -- we would have devoted

11  our resources to it if we had the time.

12         **THE COURT:**  I know.  But this is going to come up

13  again.  My guess is, if this case survives summary judgment --

14  I haven't looked at the scheduling order.  You're probably

15  supposed to be meeting and conferring about agreeing on

16  exhibits and agreeing on witnesses and agreeing on, you know,

17  all sorts of things.

18         And I'm not going to put up with, Well, we didn't get

19  around to it until, you know, the day before the documents had

20  to be filed.

21         **MR. MILLER:**  Your Honor, defendants had no -- we

22  couldn't do anything.

23         **THE COURT:**  I understand that.  I said that the

24  plaintiff had to have known.

25         Now, I still think that you probably could have

1  agreed to some of them, even if it was just 12.  Okay.  But I'm

2  simply saying is what happened here isn't going to happen in

3  the future, and you're going to have joint obligations.

4         The second thing I want to comment on is, I told you

5  before that I would hope that you would avoid purple prose and

6  personalities, and focus on advancing and advocating your

7  clients' interest.

8         Now, one of the issues I've been struggling with is:

9  What do I make with the fact that, apparently, the draft

10  application, or whatever you want to call it, did not include

11  the language "engineered access," and then the policy gets

12  written or bound, and then the signed application with that

13  language inserted appears?  And that's the final application.

14         Now, nobody really provided me with any meaningful

15  analysis of:  What are the legal rights and obligation?  Who

16  bears the risks?  What are the duties?

17         Instead -- and I'm quoting from -- must be the

18  opposition, page 18.  "Unionamerica argues that, quote, it is a

19  complete mystery how defendants could possibly claim that they

20  divulged all they knew about the risks they sought to insure

21  where they never mentioned the engineered access systems."

22         "Really?"  Says the defense.  "Beeche expressly

23  identified engineered access on the signed 1999 application."

24         Well, and that's about it.  And nobody provides me

25  with any meaningful analysis of:  What does it mean that the

1 language didn't appear on the original application; did appear

2 in the signed application; the signed application, I think, is

3 the final one; and so on and so forth.

4          So what I'm simply saying is for one side to say it's

5 a complete mystery how they could possibly claim, and then for

6 the other side to come back and say, "Really?  We expressly

7 identified it on the signed application," knowing that the

8 policy had already been bound by then, is not the level of

9 advocacy that I would -- well, that I think the clients expect.

10          **MR. MILLER:**  Your Honor, I apologize to the extent

11 that we left out the next sentence in that statement, which

12 would have been, "They had it in 1999."

13          The policy at issue, the policy that was really at

14 issue here, was issued in 2001 --

15          **THE COURT:**  That's my first question.  What is the

16 policy that covers -- that provides coverage for the underlying

17 state cases?

18          **MR. MILLER:**  It's the 2001 policy, Your Honor.

19          And the underwriter testified to me in deposition in

20 Dallas that she had the signed, the signed 1999 application

21 that said "engineered access" in front of her when she bound

22 the 2001 policy.

23          There was -- I'm sorry.

24          **THE COURT:**  Does Unionamerica agree that the 2001

25 policy is the one that it's really seeking to rescind?

1    Because I've got a lot of argument about the '99

2 application, the 2000 policy, and the 2001 application.  I'm

3 not even sure I have the 2000 application in front of me.  I

4 have to think about that.  But is it the 2001 that's really the

5 key one?

6    **MS. PRESS:**  It's the key one.  But Unionamerica is on

7 two policies.

8    **THE COURT:**  I understand that.

9    **MS. PRESS:**  It's seeking to rescind both.

10   **THE COURT:**  Let me ask you one other question.  Does

11 Unionamerica agree that U.S. Risk is its agent for these

12 purposes?

13   **MS. PRESS:**  Yes, Your Honor.

14   **THE COURT:**  So the knowledge and information that

15 Hoffman and Prah had is Unionamerica's?

16   **MS. PRESS:**  Correct, Your Honor.

17   **THE COURT:**  All right.  Look.  Let me just -- I'd

18 like you, if I can, to sort of focus your time -- I'll give you

19 a chance to say anything you want.  I would like you to focus

20 on sort of the issues that are troubling me.

21   I sent one of them out.  I don't know if you got a

22 notice, because there's an evidentiary issue that, you know,

23 summary judgment, and you've got to be very careful.  But I

24 have some other questions.

25   So all I'm simply saying is, for these two issues, if

1  the case survives summary judgment, just focus in the future --

2  I'm not going to have a jury here. So I'm not going to have

3  any qualms at all about stopping the proceedings and getting on

4  counsel if I feel that they're letting -- this case is being

5  tried on a purple prose basis.

6         Now, as I see the Unionamerica's motion, it really

7  focuses on two issues: The representation or

8  misrepresentation, depending on which side you're on, about the

9  values of the product, and especially the maximum value, and

10  the failure to provide the brochures with respect to Beeche.

11         With respect to this issue about premiums, my view is

12  very simple. To the extent that that information about

13  premiums is in the reply comes in for the purpose of rebutting

14  some of the very broad statements in the opposition that, "We

15  answered everything truthfully," I'm going to allow it.

16         To the extent that Unionamerica is trying to make a

17  new argument that they're entitled to rescission because the

18  premiums are misrepresented, I consider that a new argument.

19         I didn't see it in the opening papers. And I have

20  read all of your papers twice, read all your briefs twice. I

21  have read more of the exhibits -- I've never had a motion this

22  big. In fact, I had to take -- have my secretary break

23  Unionamerica's exhibit binder in half because I couldn't lift

24  the original one.

25         I've read all your briefs twice. I've read a lot of

1 the statements of fact. I've read many of your cases. I've

2 read a lot of depositions, and so on and so forth.

3       I didn't see anything in the opening papers that said

4 that a ground for rescission had to do with the policy

5 representations about premiums. And so I'm not going to allow

6 that on the summary judgment motion, but I will allow it in for

7 purpose of rebutting general affirmance of truthfulness.

8       So, basically, what it boils down to, to me, is

9 misrepresentation of the value and failure to include

10 brochures.

11       Now, the first issue that I'm struggling with is:

12 Exactly what is the standard that the two companies have to

13 follow, the insured in responding or divulging information, and

14 the insurer in processing it?

15       Now, nobody has cited me to a case involving an

16 application for commercial insurance of this kind. You've

17 cited me to a lot of life insurance, health insurance, some

18 fire insurance cases.

19       I've done a lot of looking, and I really haven't

20 found much. I found one or two cases having to do with D&O

21 policies, that you all haven't cited.

22       Is anybody aware of anything that I need to know?

23       **MS. PRESS:** Yes.

24       **MR. MILLER:** There is the general statutory language,

25 Your Honor, that governs what policyholders are obligated to

1   disclose and what insurers --

2           **THE COURT:**  Right.

3           **MR. MILLER:**  -- are obligated to do in response to

4   that.

5           **THE COURT:**  I've looked at -- what is it, 332?  One

6   of the statutes that you cite.  But, really, I don't understand

7   how it would work in this context.

8           **MR. MILLER:**  Here's how -- Your Honor, if I could,

9   here's how it works in this context.

10          **THE COURT:**  Hold on.  I'm trying to find 332.  It's

11  in your papers.

12          **MR. MILLER:**  It's very short.  One sentence, Your

13  Honor.

14          **THE COURT:**  What page is it?

15          **MR. MILLER:**  Do you have the page?  In our -- the

16  page of our opposition, Your Honor?

17          **THE COURT:**  Right.

18          **MS. PRESS:**  Your Honor, while you're looking for

19  that, I might be able to clarify.

20          **MR. MILLER:**  Your Honor --

21          **THE COURT:**  You'll get your chance.  You'll get your

22  chance.

23          **MS. PRESS:**  There are no cases about CGL gap

24  applications.

25          **THE COURT:**  It's not just gap policies.

1          Look.  In my mind, it's one thing to say to somebody,

2  Tell us whether you ever had a heart attack, or, you know, Tell

3  us whether you've ever had these kinds of health problems, and

4  then expecting somebody to, quote, Tell me everything you know

5  about your heart condition.

6          And it's different to simply say to somebody who has

7  eight subsidiaries and manufactures thousands of products, and

8  simply say, Tell me everything you know.

9          If the duty were literally that, why would you even

10  need an application?  You would simply send out a one-line

11  question, saying, Tell me everything you know.

12          **MS. PRESS:**  And that's a good point.  And that's why

13  this case boils down to the brochures.

14          **THE COURT:**  Well, I'll come back to that.  I just

15  want to flesh out the duties.  I do intend to spend time on the

16  brochures.

17          **MR. MILLER:**  Your Honor, 332 says, "Each party to a

18  contract of insurance shall communicate to the other in good

19  faith all facts within his knowledge which are or which he

20  believes to be material to the contract and to which he makes

21  no warranty, and which the other has not the means of

22  ascertaining."

23          **THE COURT:**  So stop and think.  What does that mean

24  to you in this context?  It's the exact opposite of what I just

25  told Ms. Press.

1          **MR. MILLER:**  What that means --

2          **THE COURT:**  You send your application back, and you

3    say, I'm not going to tell you anything because you have the

4    opportunity to learn everything.

5          **MR. MILLER:**  No, Your Honor.  No, no.  Our

6    application says "engineered access."  And in the year at issue

7    it says, twice, "access platforms."

8          They do absolutely nothing when they had -- if they

9    had any question about what an access platform was, if they had

10   any question about what engineered access is, they had the

11   means.  They had the internet.

12         For Ms. Prah to say in 2000 that a senior underwriter

13   in the oil and gas industry did not have access to the

14   Internet, I'm sorry, Your Honor, does not pass the smell test.

15         **THE COURT:**  Well, but is that the standard on summary

16   judgment?  I mean, if she says it and I have no evidence to

17   dispute it.

18         **MR. MILLER:**  We do have evidence.

19         **THE COURT:**  I know you've given me evidence that

20   Hoffman had Internet access.  But Prah says she didn't.

21         **MS. PRESS:**  Your Honor, may I respond?

22         **THE COURT:**  Just hold on for a moment.  One at a

23   time.

24         **MR. MILLER:**  Prah was Hoffman's supervisor.

25         **THE COURT:**  Right.

1           **MR. MILLER:**  There are certain commonsensical

2    conclusions that I think the Court can reach, including that

3    she had access.

4              But, Your Honor, whether they had access to the

5    Internet or not is really -- certainly, we think it's

6    dispositive.  But even if somehow one were to believe that they

7    didn't have access, and that they somehow did not have the

8    means of ascertaining this, we told them what the product was.

9    They chose to do nothing.  And here's the reason.  Here's how

10   we dovetail into the value issue.

11             The reason they chose to do nothing -- in fact, they

12   had no idea what an access platform was.  Or both the

13   underwriter and the -- and the client in London testified to me

14   that they had no idea what either one of these were.

15             The reason they didn't is that they did not care.

16   The reason they did not care is that they told me that it made

17   no difference.  The only thing that mattered was the value, the

18   hundred-thousand-dollar figure.

19             That being the case, Your Honor, there is plenty of

20   law, including the Clarendon case, that says that, as a matter

21   of law, any omission by -- on our part could not have been

22   material because you have to look at subjective intent.  That's

23   what the Clarendon case says.  Subjective intent of the

24   underwriter.  What would it have done?

25             Ms. Prah -- and if I could direct Your Honor to her

1   deposition, page --

2            **THE COURT:**  I've read her testimony.

3            **MR. MILLER:**  What she says -- I specifically said at

4   page 125 of her deposition:

5            "You didn't ask the broker of Fort Miller

6            what it meant by access platform?

7            "No.  It didn't change the value any."

8            **THE COURT:**  Well, let me just turn around, Ms. Press.

9   I stopped you several times.  I don't know in what direction

10  you want to proceed, but one of the questions I was going to

11  ask you is:  Why didn't Ms. Prah ask what engineered access

12  platforms meant, if she didn't know?

13           And, really, to me, that's part of, really, the

14  broader question.  If the insurer believes that the policy is

15  incomplete or is missing information or, I guess by extension,

16  maybe there's information on there that it doesn't understand,

17  what is its duty?

18           **MS. PRESS:**  Thank you, Your Honor.

19           First of all, I would just like to take a step back

20  and clarify.  The main --

21           **THE COURT:**  I've been watching too many presidential

22  debates, folks.

23           **MS. PRESS:**  Just because I want to make sure everyone

24  understands.  The main basis of this motion is that defendants

25  failed to disclose the nature of the risk itself.

1          **THE COURT:**  Well --

2          **MS. PRESS:**  And that has to do with the brochures.

3          **THE COURT:**  Right.  We'll come back to the brochures.

4   You want to go to the brochures?

5          **MS. PRESS:**  No, I just want to --

6          **THE COURT:**  Do you have a view of just the general

7   question that I've asked?

8          **MS. PRESS:**  Yes, Your Honor.

9          **THE COURT:**  Which is:  What is the insurer's duty, in

10  effect, in processing the application?

11         You've made your view clear to me.  I understand it.

12  And I've read the cases.  You think the insured has a duty to

13  disclose everything it knows.

14         And I've looked at those cases.  And what I've

15  noticed about them is that the subjects that were -- the

16  factual predicate for those broad statements is usually a

17  fairly focused inquiry, almost always on something like:  Have

18  you had a heart attack before?  What's the size of your

19  building?  You know, things of that sort.  You know, as opposed

20  to:  Tell me everything you know about your business.

21         But I understand your argument.  So the question I'm

22  asking you now, what's the insured's duty when the insured gets

23  an application?

24         **MS. PRESS:**  What we have here -- we'll focus on the

25  2001 application.

1          **THE COURT:**  And I'll give you plenty of time to talk

2     about the brochures.

3          **MS. PRESS:**  No, I understand.

4          On the 2001 applications, the phrase is "access

5     platforms," products manufactured, and includes access

6     platforms.

7          Access platforms -- although defendants used that

8     term to refer to their massive engineered access systems,

9     they're also concrete handicap ramps.

10         Ms. Prah testified at deposition that when she saw

11    that, she thought some kind of ramp, a concrete handicap ramp.

12    And that's why I went on the Internet to see, are there such

13    things as concrete access platforms?

14         **THE COURT:**  Let me say one thing.  I didn't pay too

15    much weight to Internet searches and explorations that were

16    done in 2008, because I have no idea whether that information

17    would have been on the Internet, assuming she had access, in

18    2001 or 1999.

19         I'm just putting you on notice that I did not give

20    either of your November searches much weight.

21         **MS. PRESS:**  Thank you, Your Honor.

22         My point is, can the underwriter be an idiot and

23    close its eyes if it sees a giant red flag on an application?

24    Absolutely not.  There's no question.  If it said on that

25    application "access platforms attached to rocket ships" or

"access platforms attached to the Trump Tower," or something

that would alert the underwriter that this was something other

than a regular old concrete access platform, I don't think the

underwriter could have done nothing.

Given what they said, "products manufactured" and

they're including "access platforms" -- and she did testify she

thought they were handicap ramps -- that did not disclose the

nature of the risk.

And I want to add to this, Your Honor, that in the

counterclaim, at page 15, paragraph 16, defendants make the

representation that access platforms have a maximum value in

the hundreds of dollars.

So what they're saying now is including the phrase

"access platforms" on that application disclosed the nature of

the risk.  We're not talking about the products or the value of

the products.  It disclosed the nature of this risk, of these

massive systems, where when they break people die, even though

even they admit access platforms are not these giant things

attached to the bridges, and they're not even the Beeche Crab

that hoists materials around.  They say access platforms have a

maximum value in the hundreds of dollars.

So getting back to your question, which is --

**THE COURT:**  What's wrong with that statement?

**MS. PRESS:**  Because they're claiming that the phrase

"access platforms" disclosed the nature of the risk, of the

1  Beeche risk, without any brochures, without anything else.

2  **THE COURT:**  I can tell you right now, Mr. Miller, if

3  this case goes to trial, bring your checkbook with you.

4  Part of where I think we're going to wind up is a

5  discussion of platforms and systems.  But maybe this is a good

6  time, since it sounds like you're not going to be able to

7  restrain yourself, let's talk about the brochures.

8  Part of what's troubling me, I guess, is -- and maybe

9  I need to turn to Mr. Miller.  Does Union -- does Fort Miller

10  concede that in 1999, it had brochures that were available to

11  customers with respect to Beeche products?

12  **MR. MILLER:**  Yes, Your Honor.  And those were

13  available on the Internet.  Whether they were available

14  otherwise than on the Internet, we don't know for sure.  But

15  they certainly were available on the Internet.  That's, in

16  fact, where plaintiffs got them in the first place.

17  **THE COURT:**  All right.  So that's question number

18  one.  Because it wasn't clear to me.  I was given a lot of

19  brochures.  I've got a '93 brochure, for example.  But it

20  wasn't clear to me that those were available to customers in

21  1999.

22  Now, the second question is, what does Union -- does

23  Fort Miller contend that it, through Ms. Marshall -- as I

24  understand it, you had -- Fort Miller had no direct dealings

25  with U.S. Risk; they were all through this intermediary, your

1 broker, Ms. Marshall?

2          **MR. MILLER:**  I believe that's correct.

3          **THE COURT:**  And do you believe that Ms. Marshall was

4 your broker, in effect, your agent?

5          **MR. MILLER:**  I wouldn't -- I wouldn't concede right

6 now that she is our agent.  She certainly was our broker.  We

7 haven't gotten that far yet.

8          **THE COURT:**  So to whom do I attribute her knowledge

9 and her conduct?  This is -- nobody commented on this, that I

10 remember in the papers, but it seemed to be assumed that she

11 was acting on your behalf and that she was getting her

12 knowledge from you.  And nobody suggested that I impute her

13 knowledge to U.S. Risk.  Because if I do, that pretty much ends

14 the case.

15          **MR. MILLER:**  It does, your Honor.  And there is

16 extrinsic evidence that is not in this -- not before Your Honor

17 today, that goes to that issue, that may suggest that her

18 knowledge would be imputed to Union America.  But I --

19          **THE COURT:**  Well, let me move on because that's not

20 before me.  Let me just ask you this factual question.  Does

21 Fort Miller contend that through Ms. Marshall or through -- or

22 otherwise it mailed a copy of any of the Beeche brochures to

23 U.S. Risk?

24          **MR. MILLER:**  We don't know.

25          **THE COURT:**  We don't know.

1          **MR. MILLER:**  We simply don't know.

2          **THE COURT:**  All right.  So let's deal with that

3  issue.  The burden is on Unionamerica on -- it's a summary

4  judgment motion, so they're ultimately going to have to prove

5  all the facts that relate to rescission, that give them grounds

6  for rescission.

7          The cases seem to put, you know, a lot of burden on

8  them to do that.  So my question is:  What proof do I have that

9  there were any brochures available that were not sent to U.S.

10 Risk?

11          **MR. MILLER:**  There are -- there is none.

12          **THE COURT:**  That question was directed to Ms. Press.

13 You'll get your chance.

14          **MR. MILLER:**  Okay.

15          **THE COURT:**  Maybe I should get you to pull your

16 checkbook out now.

17          The way it works, again, if this case survives

18 summary judgment, it's two bites at the apple.  Frankly, if we

19 get to trial you'll have all the bites you want.  25 bucks for

20 the next bite, 50.  It goes up exponentially.

21          Go ahead, Ms. Press.  The question is:  What evidence

22 do I have that -- because the burden is on you that there were

23 brochures available to clients or customers that were not

24 provided to you.

25          **MS. PRESS:**  Thank you, Your Honor.

 1          Firstly, and this goes back to the notice from

 2     yesterday and your question today, Exhibit 1, the 1993

 3     brochure, we did not get that off the Internet.  That's a

 4     brochure.

 5          **THE COURT:**  Okay.  Well, let's stop right there.  Do

 6     I have any evidence in front of me that that brochure was

 7     available in 1999, to clients?

 8          I thought hard about this because Fort Miller takes

 9     over Beeche in 1998.  And I'm sitting there thinking, I can't

10     simply assume, in connection with denying somebody their day in

11     court, that that brochure was available in 1999.  It seems to

12     me I have to have some proof.

13          **MS. PRESS:**  They don't dispute that it was created in

14     '93.  They don't dispute it's a brochure.

15          **THE COURT:**  Right.

16          **MS. PRESS:**  They don't --

17          **THE COURT:**  But the key question is, was it -- look.

18     Your application says -- I'm starting to get overwhelmed by

19     paper.  Your application is pretty clear.  It says, "Attach any

20     product brochures that you make available to customers."

21          So the issue for me is very simple.  First one, you

22     have to show me that they have product brochures that they made

23     available to customers at the relevant period.  Because I

24     wouldn't consider it material if, say, they had a brochure that

25     was available five years earlier or ten years earlier or

1    something like that.

2           And then the next question is, you have to prove that

3    you didn't get it.  So --

4           **MS. PRESS:**  Correct.  Your Honor, I would like to

5    start with Exhibit 33.  Exhibit 33 --

6           **THE COURT:**  Let me get it.  Exhibits are over here.

7           **MS. PRESS:**  I threw my back out carrying these this

8    morning.

9           **THE COURT:**  I don't know why you folks do this.

10          Exhibit 33.

11          **MS. PRESS:**  Yes, sir.

12          **THE COURT:**  Hold on for a moment.  Different binder.

13          All right.  I have 33 in front me have.

14          **MS. PRESS:**  Thank you.

15          Attached to Exhibit 33 are the brochures, all of the

16   brochures that were provided.  If you look at page 30, this is

17   from the U.S. Risk underwriting file.  Betty Prah has testified

18   these are the only ones U.S. Risk received.  If you look --

19          **THE COURT:**  Well, she didn't say that.  She couldn't

20   have said that because she wasn't involved at the time.  What

21   she almost said was custom and practice.  But if you read

22   through her declaration, she said everything but what she had

23   to say.

24          **MS. PRESS:**  She said --

25          **THE COURT:**  Let me just find out.  So here I've got

1   it.  I've got a brochure, beginning with 95, from Fort Miller

2   Company.  So it goes 95, through, looks like, 115 -- I'm sorry,

3   116.

4           **MS. PRESS:**  At the top of page 113, Your Honor, is

5   the note from the broker saying, "This is a descriptive booklet

6   on all products."

7           **THE COURT:**  Uh-huh.

8           **MS. PRESS:**  "If you wish to review any item, I will

9   fax you.  Please advise."

10          **THE COURT:**  Right.

11          **MS. PRESS:**  So here's what we get.  We get all of

12  these brochures.  And if you look at the table of contents, it

13  lists hundreds of products.

14          **THE COURT:**  Right.  But it also says, "Fort Miller

15  Company."

16          **MS. PRESS:**  That's correct.

17          **THE COURT:**  And I noticed that -- I take that as

18  meaning here's all of Fort Miller's products.

19          **MS. PRESS:**  There are also other brochures in this

20  stack.

21          **THE COURT:**  There are other brochures of what I

22  assume are some of the other companies involved, like Tie

23  Metal.

24          **MS. PRESS:**  That's correct.  There's a fencing

25  brochure.  There's a gate brochure.

1        **THE COURT:**  All right.  In other words, I don't read

2   that brochure -- again, it's summary judgment.  So I have to --

3   you know, I have to review all the evidence most favorably to

4   the party resisting summary judgment.

5        I don't view that note as saying, Here is something

6   about all the products that all the Fort Miller companies make.

7   I view that as saying, Fort Miller Company, Inc. makes all

8   these products.  If you want any of the specific brochures,

9   we'll provide them.

10       **MS. PRESS:**  The point is that there is no Beeche

11  brochure at any time.

12       **THE COURT:**  Right.  What evidence -- so I come back

13  to the question of, one, well, it sounds like you're not

14  disputing that there were Beeche brochures available to

15  customers.  But you're saying, what, they were only online?

16       **MR. MILLER:**  Your Honor, they were -- they were

17  absolutely online.  Whether they were available other than

18  online, I don't know.

19       But the real issue here, Your Honor, what Counsel has

20  just read to you, this handwritten note, is unauthenticated,

21  and it is contrary to other evidence that we have in the case.

22       **THE COURT:**  Well, before we get there, I didn't read

23  that as saying that, you know, this -- these three pages, this

24  table of contents, is to all products of all Fort Miller

25  companies.  And it doesn't seem to be -- we're not really

1  arguing about any Fort Miller Company products.  We're arguing

2  about Beeche.

3          **MR. MILLER:**  That's right.

4          **THE COURT:**  So I'm still trying to find out -- it

5  sounds like -- let's assume for purposes of summary judgment I

6  assume that there were brochures that could have been made

7  available with -- let me deal with the Internet issue.  We'll

8  come back to Hoffman.  At any time did either Marshall or Fort

9  Miller direct U.S. Risk to the Internet?

10          **MR. MILLER:**  Yes, Your Honor.  Absolutely.  That is

11  in Barbara Marshall's --

12          **THE COURT:**  No, no, I don't mean that.  I mean,

13  Barbara Marshall said that because she says Hoffman was

14  looking.

15          **MR. MILLER:**  Correct.

16          **THE COURT:**  In other words, did you answer the

17  question when it says, "Provide all the brochures that are

18  available," say, "Here are brochures that are available in hard

19  copy, and the brochures that are available online can be found

20  at this URL"?

21          **MR. MILLER:**  Yes.  According to the quotation from --

22  and, again, I'm answering the question in the context of what

23  Ms. Marshall said, because that's the evidence that we have.

24  She said in --

25          **THE COURT:**  Prior to Hoffman talking to Marshall --

1      **MR. MILLER:**  Yes.

2      **THE COURT:**  -- did you ever direct U.S. Risk to go

3  online?

4      **MR. MILLER:**  I don't know the answer to that.

5      **THE COURT:**  Don't know the answer to that.

6      Let's put aside the online stuff for a moment.  We'll

7  have to come back to that.  Let's just deal with plain old

8  hard-copy brochures.

9      What evidence do I have in front me that there were

10  hard-copy brochures that were not provided -- that were

11  available to clients in 1999, that were not provided to U.S.

12  Risk?

13      **MS. PRESS:**  In Betty Prah's declaration -- you

14  understand we're trying to prove a negative.

15      **THE COURT:**  Yeah.

16      **MS. PRESS:**  That's our burden.  In her declaration,

17  paragraph 38, she talks about her expectation that insureds

18  provide every brochure.

19      **THE COURT:**  Right.

20      **MS. PRESS:**  Paragraph 39, nothing that she was

21  provided.  But it's more clear in paragraph 40.  "It was

22  defendant's responsibility to provide U.S. Risk with all

23  brochures."

24      **THE COURT:**  Uh-huh.

25      **MS. PRESS:**  "Defendants did none of this."

1          THE COURT:  But she simply says that.  That's a

2    conclusory statement.  Is that basically it?

3          MS. PRESS:  The only thing that she can say is, "I

4    have an underwriting file in front of me."

5          THE COURT:  And it's not in the file.

6          MS. PRESS:  "There's nothing in it."

7          THE COURT:  And what is missing -- because I read

8    this very carefully -- is any statement that everything that

9    was provided by Marshall was in the file.

10          MS. PRESS:  No.

11          THE COURT:  She comes close to trying to say that.

12          MS. PRESS:  I think she says it.  I mean, we were

13    very careful to go through the procedure.

14          THE COURT:  Where does she say it?

15          MS. PRESS:  Well, understand she didn't handle the

16    account at the very beginning.

17          THE COURT:  But these are proof issues.

18          MS. PRESS:  Right.

19          THE COURT:  I understand that.

20          MS. PRESS:  So she --

21          THE COURT:  Occasionally things just can't be proven.

22          MS. PRESS:  Right.  So she explains that when a

23    document comes in -- I mean, it goes through excruciating

24    detail.  We stamp it either on the first page or the back of

25    the first page.

1      **THE COURT:** Right.

2      **MS. PRESS:** It's placed into the file. This is

3 exactly what the file looks like. Here's what we do when we

4 fax documents. Here's what we do when we receive faxed

5 documents.

6          And then she goes through. And as she authenticates

7 different documents, she says, This one, the underwriting file,

8 shows that this was received on this date because it has a

9 received stamp, or whatever it is that led her to draw that

10 conclusion.

11          Also, keep in mind that the broker has produced its

12 file as well. There's not a notation. There's nothing in

13 their file. There's no memo saying, Here, here are some Beeche

14 brochures. Here, look at the Beeche Internet.

15          So I'm trying to prove a negative, but the best I can

16 do to tell you that there's nothing in the broker's file is

17 testify myself, which I can't do.

18          If there were something to dispute what Betty Prah

19 said, it was incumbent upon defendants to present that

20 evidence.

21      **THE COURT:** Let's find out. Let's find out. So what

22 I'm basically being told is Prah -- I think what counsel is

23 referring to are the paragraphs which I think appear a little

24 earlier, in which she basically says -- sort of testifying as

25 custodian of record -- how files are maintained.

1        And what she's basically saying is, if it had been

2  sent, it would be in the file.  And it's not in the file.

3  Therefore, I'm being asked to assume that it wasn't sent.

4        What you're telling me is, you basically, sounds

5  like, don't know whether it was sent or not.  And there's

6  nothing in Marshall's file or AGF's files -- I know Marshall

7  talks something about having a binder with all the brochures.

8  That binder doesn't exist.  No one found it.

9        **MR. MILLER:**  The -- we simply don't know, Your Honor.

10  The first question, though, I thought that you had asked

11  counsel, was whether we had -- whether there was proof in the

12  file that there were physical copies beyond the Internet.

13        I don't know the answer to that either.  That was, I

14  thought, the question that you were -- that you were trying to

15  get at, whether there were physical copies of these brochures.

16        **THE COURT:**  But I don't think on summary judgment you

17  can simply say, "I don't know."  I think on summary judgment I

18  think that she puts in some evidence that there were -- "We

19  didn't get any," and then the question -- you don't dispute

20  that there were some.

21        Then the question is:  Well, where does that take me?

22  Simply saying, "Well, I don't know whether we sent them"

23  doesn't get me anywhere.

24        **MR. MILLER:**  Here's --

25        **THE COURT:**  Doesn't get you anywhere.  It may get me

1 a lot of places.

2     **MR. MILLER:**  Here's where -- first of all, if I could

3 step back just for a second.

4     We're still missing sort of the fundamental point

5 that I was trying to make earlier, and obviously not well

6 enough, which is that it doesn't fundamentally -- first of all,

7 we believe we told them everything that they needed to know.

8 They were on complete notice and had ability to ask whatever

9 questions.  I think that's pretty clear.

10     But, fundamentally, Your Honor, it doesn't matter

11 whether we were making dynamite.  It doesn't matter what we

12 were making because --

13     **THE COURT:**  It was immaterial.  I got that argument.

14     **MR. MILLER:**  They just simply did not care.  They

15 wouldn't have looked at the brochures, in any event.

16     However, getting back to the question of what was

17 provided, I asked Ms. Prah if -- Your Honor -- Your Honor made

18 a very astute observation, which was, you go through her

19 declaration and she says all sorts of things.  But what she

20 doesn't really come out and say is that, "I can, in fact,

21 authenticate this entire file and that nothing, Your Honor, has

22 been taken out of it."  That nothing has been taken out of it.

23     We have reason to believe that there is a chance that

24 that file is not complete, that -- and the reason I bring this

25 up is that in the -- after -- after Ms. Press went through the

1  underwriting file with Ms. Prah in her deposition, I then went

2  back and was able to establish in the deposition that she had

3  no personal knowledge of any of this.  And that, Your Honor, I

4  believe is why you see a disconnect in her declaration as to

5  what was provided and what was not provided.

6           **THE COURT:**  Let me make this observation, which may

7  help you all at least know how I see the case.

8           I'm holding Unionamerica to the knowledge that

9  Hoffman had.  I must say I agree with Ms. Press that, once

10 again, I read the opposition thinking, Wonder why they're

11 hiding Hoffman?  Only to be told in the reply she's dead.

12 Didn't think that was the proper way of presenting that

13 information.

14          But it seems to me that the underwriting decision,

15 the real underwriting decision was made when U.S. Risk

16 determined to place this risk.  And so information -- I don't

17 think I can divorce what Prah knew in 2001 from what Hoffman

18 knew in 1999.  Certainly, not for purposes of, I think, for

19 summary judgment.  May be that I'll get testimony, if this case

20 survives, that would cause me to change my mind.

21          So the -- you know, the issues that I'm sort of

22 struggling with is trying to figure out what -- my first, I was

23 trying to figure out:  What happened in 1999?

24          Based on this record, it looks to me -- I don't think

25 I can avoid making a finding, if I had to, that there was

material that was not transmitted by Marshall along with her

initial transmission of the draft policy, whatever you want to

call it, and at least some brochures.

Because I think, as Ms. Press has pointed out, you

really haven't disputed it. To simply say, "We don't know what

was there, and we have reason to think that the stuff was not

in the file," I'm not sure that that really cuts it.

One of the things that troubled me about this case is

I'm surprised, I gather -- who made the decision in 1999, to in

effect place this insurance?

**MR. MILLER:** That was Sandy Hoffman.

**THE COURT:** By herself?

**MR. MILLER:** But Ms. Prah was her supervisor at the

time, so --

**THE COURT:** Ms. Press, who made this decision?

They're your clients.

**MS. PRESS:** That's correct, Your Honor. It was

Ms. Hoffman.

**THE COURT:** But how could she have done that? She

had no authority, as I read your guidelines, your -- you know,

don't know if "guidelines" is the right word. Three people had

the authority, as I understood it, to place the risk. None of

them was Hoffman.

**MS. PRESS:** Betty Prah.

**THE COURT:** Prah is one. Somebody named Wesson

1  (phonetic) was another.

2           **MS. PRESS:**  Correct.

3           Your Honor, if you look at the rating sheet you'll

4  see at the bottom two sets of initials.  That's the actual

5  rating sheet.  One is Sandy Hoffman's, and the second is Betty

6  Prah's.

7           **THE COURT:**  And there is no information, there's no

8  sort of a transmittal memorandum that I've seen in some of

9  these other insurance cases, where somebody says, okay, we have

10 this new application; I've analyzed the risk; here's the way I

11 see it; here's the premium that I've devised; I recommend we

12 place this.  There's nothing like this.

13          **MS. PRESS:**  Betty Prah had the authority to place it.

14 Her initials are on the rating sheet.

15          **THE COURT:**  Right.  But there's no transmittal

16 between Hoffman and Prah.

17          **MS. PRESS:**  No, there isn't.

18          **THE COURT:**  Okay.

19          **MR. MILLER:**  Your Honor, the fact --

20          **THE COURT:**  I mean, I don't attribute anything

21 significant to that, one way or the other.  You know, I've seen

22 cases in which these kinds of things were done orally, and I've

23 seen cases in which they were done in writing.

24          **MR. MILLER:**  The fact that Betty Prah -- I think

25 we've all now narrowed it between Ms. Hoffman and Ms. Prah, the

1  fact that Betty Prah was at least at some level involved in

2  1999.  May be here nor there.  But the fact is, in 2001 she

3  didn't care what the brochures said.  She -- she didn't care.

4  And it wasn't -- it wasn't once, it was twice in her

5  deposition.

6          And Timothy Open, in his deposition -- who is her

7  customer at St. Paul in London -- told me the exact same thing.

8  I asked him:

9          "What did St. Paul understand, quote, access

10          platform meant in 2001?

11          **"ANSWER:**  I don't believe we knew what it

12          would have meant in 2001."

13          And there's a reason.  He didn't know -- London

14  didn't know.  Dallas, U.S. Risk didn't know.  They didn't care.

15  It didn't affect the -- the only conclusion that can be drawn

16  from that, under the Clarendon and other cases, is that it did

17  not affect -- it could not, as a matter of law, have affected

18  the underwriting decision.

19          We don't know why we're here.

20          **THE COURT:**  Let me ask you this question.  Well,

21  before we move on, let me just ask one more question of the

22  brochure.  I want to get my questions out.  I've got one more

23  series of questions, and I'll turn it over to you.

24          With respect to these brochures -- this is really a

25  question for Ms. Press -- if I accept your version of what you

1  are telling me, Hoffman or Prah -- I don't know for these

2  purposes it makes a difference whether we're in 1999 or whether

3  we're in 2001 -- they have an application, are being asked to

4  insure eight companies, and they've got no brochures with

5  respect to Beeche.  What is their obligation at that point?

6        **MS. PRESS:**  There are no brochures with respect to

7  several other companies on that list, as well.

8        **THE COURT:**  All right.  What is their obligation?

9  They know they're being asked to insure a bunch of companies

10  for which the applicant has given them no information.

11        Do they simply say:  All right.  We'll go ahead and

12  insure them.  And then if something comes up, we'll rescind the

13  policy?  Or do they have a duty of some inquiry?

14        **MS. PRESS:**  There is no case in California or the

15  authority of the Ninth Circuit that says it's their burden to

16  start asking questions at that point.  There has to be some

17  sort of giant red flag.  They're told --

18        **THE COURT:**  I haven't seen a giant red flag case.

19  I'm sure --

20        **MS. PRESS:**  And, Your Honor, I want to clarify

21  something, because it's very important.  Mr. Miller advised

22  that Timothy Open in London had no idea what access platforms

23  were in 2001.  That's absolutely correct and completely

24  misleading.  London had no connection with underwriting.

25        **THE COURT:**  I agree.  I read Mr. Open's testimony.

1           **MS. PRESS:**  Okay.  Thank you.

2           **THE COURT:**  What puzzled me more about -- well,

3     anyway, look.  There's all sorts of things that sort of puzzle

4     me.  But I want to stick to what I think are material issues.

5           So, basically, what you're telling me is that there

6     is no obligation -- this gets back to the question I asked

7     earlier.  And I would agree with you that there's not a lot of

8     law, but, Mr. Miller, how do you see it?

9           What is the obligation, at that point, of the insurer

10    and its company, in this case it's U.S. Risk, its agent, it's

11    being asked to place a risk that insures eight companies -- and

12    I'm going to accept for the moment the point which I think Ms.

13    Press perhaps has established, that there is no brochures with

14    respect to Beeche, I didn't pay attention to the other

15    companies -- breaching to be what was material here?  What do

16    you think the insurance -- or U.S. Risk, what's its obligation,

17    at that point?

18          **MR. MILLER:**  First of all, Your Honor --

19          **THE COURT:**  Do you know of any law to support it?

20          **MR. MILLER:**  I believe I do.  Tim Open was the 30b(6)

21    witness, and that's why I quoted that.  He was the 30(b)(6)

22    witness on underwriting, Your Honor.  I noticed him as a

23    30(b)(6) witness on underwriting.  That gives me the right to

24    rely upon his failure to know anything on behalf of St. Paul.

25    Okay.  And I --

1           **THE COURT:**  What would St. Paul ordinarily -- I mean,

2    my understanding of the way this works, from reading your

3    papers, is that underwriting decision has to be made by U.S.

4    Risk.

5           **MS. PRESS:**  That's right.

6           **THE COURT:**  They've been delegated.

7           **MS. PRESS:**  That's right.

8           **THE COURT:**  And I understand that St. Paul has

9    committed, in what I've heard sometimes called treaties, that

10   if U.S. Risk, you know, says that, This is a policy we want to

11   place, we'll accept the risk.

12          So why would it be relevant to me whether St. Paul

13   even reviewed the application?

14          **MR. MILLER:**  Your Honor, I think it's further

15   indicia.  I think, certainly, the fact that neither one of

16   them, neither Prah -- neither the actual underwriter nor the

17   client had any clue about it is persuasive.

18          **THE COURT:**  Prah's --

19          **MR. MILLER:**  I think it's secondary.  I agree, Your

20   Honor.  It's perhaps secondary.

21          **THE COURT:**  I think in Prah's testimony I did find it

22   important and, you know -- okay.

23          **MR. MILLER:**  If I could -- if I could go on.

24          The giant red flag, Your Honor, is the fact that

25   exactly that, Ms. Prah didn't have any clue what an access

1  platform was.

2          Now, Ms. -- Ms. Press has said, no, she said it was a

3  ramp.  That's not true, Your Honor.  Ms. Prah -- first, I was

4  in Dallas and took her deposition.  Ms. Prah first told me, "I

5  got no clue what an access platform is."  Then after a break

6  she says, "I think it was a gate."  And then after another

7  break, in the afternoon session, she comes back and says, "I

8  think it might have been a concrete ramp.  You know, like those

9  ramps that go up, I think that are retrofitted to allow

10  wheelchair access into houses."  That was a red flag.  Yes.

11  And Ms. Press says, look, if there was a red flag, they do have

12  an obligation to do some investigation.

13          But leaving that issue aside, Your Honor, here's

14  where I think the issue is really reached.  The issue of

15  materiality bears on the investigation.  So I'm going to answer

16  your investigation question with materiality because once they

17  choose to rescind the policy, they then bring up the

18  materiality issue.  And the materiality issue circumstance

19  describes what the investigation should have done.

20          Let me quote to you or cite to you the Croskey

21  treatise in California, on insurance litigation, where it says,

22  "Claims of" -- this is at -- you probably don't have it with

23  you, and I apologize, Your Honor.  I don't think we provided a

24  table with this.  That was my oversight.

25          But Justice Croskey is one of the preeminent

1  authorities, I think, on insurance litigation in California.

2  He says, at 5:227, "Claims of materiality may be attacked by

3  showing the insurer failed to treat the alleged information as

4  important when it first became aware of it."

5          So, in other words --

6          **THE COURT:**  When did it "first became aware of it"?

7  Isn't that really the problem?  In a way, the record is that

8  U.S. Risk really didn't become aware of this problem, or St.

9  Paul, until the claims started being made, because the record

10  is they didn't really understand what engineered access was.

11          **MR. MILLER:**  Exactly the point.  They had no clue

12  what engineered access was.  And they did nothing.

13          Insurance Code Section 336 says, "The right to

14  information of material facts may be waived either, a, by the

15  terms of the insurance, or, b, by neglect to make inquiries

16  about such facts where they are distinctly implied in other

17  facts of which information is communicated."

18          So to answer your question directly, Your Honor, the

19  insurer cannot bury their head in the sand and say we -- even

20  when we know nothing, Your Honor -- and this is what has --

21  this is what has irked my client from the beginning.  When they

22  knew nothing about the risk, they put their head in the sand.

23  And then when a claim comes -- and underwrite the risk, take

24  the premium.  And then when a claim comes in say, Aha,

25  misrepresentation, because we didn't -- you didn't tell us what

1 we said we didn't want to know in the first place.

2     **THE COURT:**  Well, all right.  Let me ask -- move on

3 to another area that's troubling me, and then I'll give you all

4 some time to say whatever you want.

5     Why does "engineered access" not appear in the draft

6 application?

7     **MR. MILLER:**  I think because of what Your Honor

8 picked up on about 30 minutes ago now, or so, which is -- and

9 this is my speculation, Your Honor, but maybe it will be

10 helpful -- that Beeche was only acquired in 1998.  This was in

11 1999.

12     Associates of Glens Falls had been Fort Miller's

13 broker for 20 years, 30 years.  Really, they grew up together,

14 basically, in Upstate New York.  So they had all the

15 information, but they may not have had the last year's acquired

16 company information.

17     In any event, what happened was, Barbara Marshall

18 fills out the application, sends it to Rick Shoemaker, and

19 says, "Review it.  Are we missing anything?"  Rick says, "Yeah,

20 actually, we are."

21     And, by the way, it's not just "engineered access."

22 He makes a couple of other changes.  He writes in "various" and

23 a couple of other things on the form, and then sends it back.

24 And it goes to Dallas.

25     And regardless, Your Honor, of whether the policy had

1   incepted by that time, why on God's green earth, if this were

2   such an issue, did Sandy Hoffman, when she got that, not say,

3   Okay, what is engineered access?

4           Or, more importantly, Your Honor, why did Betty Prah,

5   in the year at issue here, which is 2001, when she said she had

6   that, why did she not go back and look at that and say, Okay,

7   again, what is engineered access?

8           Well, she had the same language already on the 2001

9   form, a very similar, which was "access platform," and she

10  didn't care about that.  The reason, Your Honor, is they didn't

11  care about any of it.  It didn't make any difference.

12          **THE COURT:**  Well, but obviously -- okay.  So from

13  your perspective, you didn't know that it didn't make any

14  difference.  You're telling me that now.

15          So what you're saying happened -- and I guess I

16  didn't understand this from the facts -- is that Marshall sends

17  the -- the draft application; Shoemaker doesn't see the draft

18  application, or anyone at Fort Miller, until after it has been

19  forwarded to U.S. Risk.

20          **MR. MILLER:**  I don't know the -- I think that's true.

21  It was probably simultaneously forwarded to U.S. Risk and then

22  forwarded to Rick.  He -- the policy incepts, I think, in April

23  of '99.

24          **THE COURT:**  Correct.

25          **MR. MILLER:**  He then fills it out and signs it a

month later in -- I think his signature is dated May 19th of
1999.

        **THE COURT:**  So that's when he signs it?  Is that when
he makes the additions?

        **MR. MILLER:**  Yes.  Exactly.

        **THE COURT:**  What is the legal significance of that?
Let's just focus on that, because nobody really discussed that
in their papers, other than throwing barbs at one another.

        The policy is already in effect, but the application
hasn't been signed.  I mean, for example, supposing in the
application he had added another company or two.

        **MR. MILLER:**  They --

        **THE COURT:**  How would that work?

        **MR. MILLER:**  That's a very good question.  They could
very well have said, You know what, this is a different risk.
This is a different risk.

        **THE COURT:**  You think the risk, in effect, the
obligation to review the final signed, is on the insurance
company?

        **MR. MILLER:**  Your Honor, otherwise, why sign it?  Why
insist on a signed application?

        **THE COURT:**  Do you have any authority for that?

        **MR. MILLER:**  Uhm --

        **THE COURT:**  I'm just asking.  Be careful.  What do I
have to look for and what do you all know?  If you've looked

1    and you say it's not there --

2            **MR. MILLER:**  No, I haven't.  I can't make that

3    representation.

4            **THE COURT:**  Ms. Press, what do you think is the

5    significance of the fact -- I mean, I understand part of what

6    you're saying to me is that Hoffman wouldn't have been

7    underwriting or trying to figure out what engineered access

8    meant, because she wouldn't have been aware of it until after

9    she had, in effect, approved the risk.

10            Now, but who -- who runs the risk, then, if the

11    application comes back altered and the insurance company says

12    nothing?

13            **MS. PRESS:**  If -- once you have a policy, you have a

14    contract.  You had an offer and an acceptance.

15            **THE COURT:**  Right.

16            **MS. PRESS:**  That's basic contract law.

17            **THE COURT:**  What's integrated into the contract, the

18    signed application or the unsigned application?

19            **MS. PRESS:**  Well, Your Honor, I think --

20            **THE COURT:**  You're telling me for some purposes it's

21    the signed application.

22            **MS. PRESS:**  The most interesting part of the evidence

23    on this issue is the 2000 application.  That's Exhibit 43.

24            **THE COURT:**  Is that even in the record?  It was.

25            **MS. PRESS:**  It is in the record, Your Honor.  And

1  I'll tell you why it's so interesting.

2          **THE COURT:**  I know everybody said that that was just

3  the unsigned application.  That's Exhibit 43.

4          **MS. PRESS:**  No, that's --

5          **MR. MILLER:**  No, that --

6          **MS. PRESS:**  Counsel, please.  I gave you a chance.

7          That's the 2000 signed application.  And here's why

8  it's so interesting.  Compare it to the 1999 unsigned

9  application.

10          **THE COURT:**  Uh-huh.

11          **MS. PRESS:**  It's the same document.

12          **THE COURT:**  Uh-huh.

13          **MS. PRESS:**  It's not rewritten.

14          **THE COURT:**  Right.

15          **MS. PRESS:**  Same exact document.

16          **THE COURT:**  What do you deduce from that?

17          **MS. PRESS:**  Doesn't say "engineered access," right?

18          **THE COURT:**  I know.

19          **MS. PRESS:**  So what that means is what defendants are

20  saying is that after the policy was issued, after you have a

21  contract, even though no one said, Hey, take a look at this, we

22  added something, we added "engineered access," you should look

23  at that.  And their broker didn't notice it.  Their own broker

24  didn't notice it the next year.  And then Mr. Shoemaker, the

25  guy who's making the representations, he doesn't notice it.  He

1  signs one that doesn't have it.

2         They're holding us to a standard higher than their

3  own.

4         **THE COURT:**  Well, but do they have the right to do

5  that?  That's what I'm trying to find out.  Isn't that your red

6  flag?

7         **MS. PRESS:**  Absolutely not.

8         **THE COURT:**  How could that not be?

9         **MS. PRESS:**  The contract is already issued.

10        **THE COURT:**  Yeah.

11        **MS. PRESS:**  And we keep losing sight of something

12  very important here.  Unionamerica is not on the 1999 policy.

13        **THE COURT:**  No, I understand that.  I'm dealing

14  with --

15        **MS. PRESS:**  Nothing to do with that.

16        **THE COURT:**  -- U.S. Risk.

17        As I say, I'm holding Unionamerica in effect -- I

18  mean, you know, this is an issue you can take up on appeal.

19  Seems to me that what Hoffman knew in '99, in effect,

20  Unionamerica or St. Paul knew in 2000.

21        Hoffman, I believe, is not going to be doing a whole

22  bunch of stuff, just because it's now going through a different

23  company.  In her mind, she believes that this is a risk that,

24  you know, should be written.

25        What I don't know, and obviously we'll never know, is

what significance, if any, Hoffman attributed to the fact that

in the 2000 application the word "engineered access" doesn't

appear.  I have no idea why.

      **MR. MILLER:**  Your Honor --

      **MS. PRESS:**  Your Honor, I think --

      **THE COURT:**  Just a minute.  It's her turn.

      **MS. PRESS:**  The contract's already formed.

Defendants put into evidence testimony of Betty Prah, that she

issued policies all the time with unsigned applications.  And

she expected if there was some significant change, it would be

pointed out.

      **THE COURT:**  I understand that's her expectations.

      **MS. PRESS:**  Defendants put into evidence --

      **THE COURT:**  All I'm trying to find out is who legally

bears the risk if the signed application comes back different

than the unsigned application and then nobody does anything

about it?

      It would seem to me, from the incorporation language,

that what becomes part of the policy -- obviously, the insured

has a way of protecting against this and saying, "I'm not going

to issue the insurance until I get a signed application."  It

would seem to me that's what's being incorporated, is a signed

application.

      **MS. PRESS:**  I think you have really jumped forward to

sort of what the real issue here is, which is, even if

"engineered access" is in there, doesn't matter.  You know why?
The language is on the '99 signed application, "Products
manufactured are" this, this, this and "engineered access."

If the product -- so what defendants are claiming is
that gave you notice of this entire risk.  If they manufactured
the engineered access systems, which is something they claim
they didn't do, they're worth more than a hundred thousand
dollars.  That's in evidence, too.  They can't have it both
ways.

The point is that the inclusion of the phrase
"engineered access" doesn't matter.  Assume U.S. Risk has
knowledge of it.  Assume they do.  Even though the broker
didn't notice it, even though the insured didn't notice it --

**THE COURT:**  It's back to the materiality issue.

**MS. PRESS:**  Assume that they had knowledge of it.

**THE COURT:**  All right.  Look.  I'll give you all
about five minutes or so to just, in effect, kind of wrap this
thing up.

And it's your motion, Ms. Press, so if there's
anything you want me to point -- as I said, I've read the
moving papers twice.  And I've read an awful lot of the
depositions and exhibits, so on and so forth.

**MS. PRESS:**  Thank you, Your Honor.

The law is clear that the quality and quantity of the
misrepresentations is significant, the quantity, the sheer

1   quantity.

2           U.S. Risk was absolutely flabbergasted to find out

3   about these Beeche systems.  They are -- you have to admit,

4   they're incredible systems.  Take a look at the pictures.

5   Mr. Shoemaker testified that the most expensive one that they

6   made was a million and a half dollars.

7           They paid $3,600 for a premium.  Never disclosed the

8   Beeche systems, never disclosed the products, never disclosed

9   the nature of the risk, and never gave any brochures.  You know

10  what a red flag would have been?  A brochure.  Just one.  Just

11  one brochure.

12          I think it would be fair to say if defendants had

13  evidence they got one brochure, I would sit down, and I would

14  say, That underwriter should have taken a look.

15          But our underwriting file shows they never got any

16  brochures.  The broker file shows they never got any brochures.

17          **THE COURT:**  Isn't that so?  We haven't really talked

18  much about it.  There are no Beeche materials in the AGF files?

19          **MS. PRESS:**  There are Beeche materials.  They never

20  sent them to U.S. Risk.  In fact, one of the pieces of evidence

21  is that in 2001, which is the policy we're talking about, when

22  the broker was applying for the CGL, the partner insurance, not

23  the gap, the CGL --

24          **THE COURT:**  Right.

25          **MS. PRESS:**  -- they said, "Beeche, manufacturer of

access and containment systems," and "take a look at the

Web site."  It's all in writing.

Yet they didn't do the same thing for gap.  Why not?

Same exact time period.  Same policy period.  They go hand in

hand, the CGL and the gap.  Yet they don't give that

information to U.S. Risk.  And now they say, You should have

known because we included the phrase, quote, access platforms.

No brochures, nothing else.

They failed to disclose the nature of the risk

itself, at the same time that they disclosed the nature of the

risk to a completely different insurance company, with the

exact same policy period, and they admitted, the broker

admitted, and the evidence is in there, that the CGL, regular

CGL and CGL gap, went hand in hand, yet they leave it

completely off the 2000 application.  And in 2001, the only

thing they provide is the phrase "access platforms."

And, Your Honor, I have to address this because it's

such a harsh accusation.  The suggestion was made that at

Ms. Prah's deposition that she changed her testimony during

breaks.  And that is a direct comment about me.

Mr. Miller questioned Ms. Prah, a 73-year-old woman,

about her nine-year-old file, without letting her look at it.

That's why she would say, I don't know what an access platform

is.

You could show me a nine-year-old file, and I'm 42,

1  and -- I mean, not show me the file, and ask me questions about

2  it, and I would say, I don't remember, I'm not sure.

3          **THE COURT:**  I'm not sure why showing her the file

4  would have made a difference.  They do have a right to question

5  a litigant without -- a witness without showing the document.

6          **MS. PRESS:**  That's true.  But the idea that she

7  changed her testimony during the break --

8          **THE COURT:**  I did not attribute much significance to

9  that.

10          **MS. PRESS:**  Thank you, Your Honor.

11          **THE COURT:**  I don't think it's worth going on.

12          **MS. PRESS:**  Thank you, Your Honor.

13          **THE COURT:**  Let me find out from Mr. Miller -- this

14  was a point that I think was in the papers somewhere, but

15  wasn't stressed much -- why did Marshall tell the liability

16  carrier one thing and the gap carrier something that sounds

17  like entirely different?

18          **MR. MILLER:**  Okay.  First of all, I don't think it

19  was entirely different.  I think she filled out the nine-page

20  application.  They had five lines for the products.  She put

21  the products on.  She put the "engineered access" on.  Or Rick

22  Shoemaker did.  She then put -- or Rick then put "access

23  platform" in the year thereafter.  Here's why there's some

24  difference.

25          **THE CLERK:**  She gave him a brochure, apparently

1 directed him to the Web.

2          **MR. MILLER:**  If I could, Your Honor, page 8 and 9 of

3 our brief -- and I explained this, I think.  This is

4 Ms. Marshall's testimony.  I said because, you know, I

5 understand that was -- I understood during the deposition that

6 that was an argument that undoubtedly Ms. Press was going to

7 make.  So I asked her, at the bottom of page 8 of my opposition

8 brief:

9          "Was there any particular reason that

10          different information was provided to some of

11          the general liability carriers than was

12          provided to St. Paul?"

13          **THE COURT:**  I understood that.  I don't know that

14 that solves this problem.  She could not have known, going into

15 this in '99, that U.S. Risk was going to require less

16 information than some of these other --

17          **MR. MILLER:**  But, Your Honor, we don't know what the

18 other carriers -- as she was filling out the applications for

19 the other carriers, we have no idea what communications took

20 place between them.  They may well have said, I need this,

21 this, this, this, and this.

22          **THE COURT:**  That's true.

23          **MR. MILLER:**  And she says -- what she tells me in

24 deposition is -- at the end of the deposition is:

25          "Well, I sent them the application.  They

1          reviewed it, you know.  I asked several

2          times, you know, being a different type of

3          product, I wanted to make sure I was sending

4          them everything."

5     And then she compares that to what happened in this

6 case.  She says:

7          "The other underwriters in the other cases

8          asked me questions."

9     They wanted to know, apparently, what they were

10 underwriting.

11          That is not what happened here.  That's what my -- I

12 know I'm beating this horse silly, but these underwriters in --

13 and Ms. Press makes a big deal about the $3,000 premium.  Well,

14 that's very interesting.  A $3,000 premium for a risk of

15 $46 million, which is what was disclosed on this, how much

16 underwriting do you suppose an underwriter is going to do on a

17 risk with a $3,000 premium?

18     **THE COURT:**  Well, but I think their point is that if

19 they had gotten more information, the premium would have been

20 higher, so it might have been more --

21     **MR. MILLER:**  Well, I guess that begs -- I guess it

22 begs the question.  To a certain extent it gets circular.

23          But my point being, it seems to me, Your Honor, that

24 when we get into trial and we get into these issues, what Your

25 Honor will see -- unfortunately, I know Your Honor is rolling

1  your eyes, and I apologize for that.

2          **THE COURT:**  Well, you're assuming you are going to

3  get into trial.  I haven't quite gotten there yet.

4          **MR. MILLER:**  Okay.  I don't mean to be presumptuous.

5          But I think what Your Honor is going to see is that

6  for a $3,000 premium, poor Ms. Hoffman, sitting in Dallas,

7  Texas, you know, is not doing much, other than taking the file

8  and --

9          **THE COURT:**  The point I'm trying to make, Mr. Miller,

10  is, I have to decide this case on this record, not what I'm

11  going to see at trial.  That's why I am rolling my eyes.

12          **MR. MILLER:**  I was just responding to the comment

13  about the $3,000 premium.

14          **THE COURT:**  Ms. Press, is there anything further?

15  I'll give you another minute or two.  I want to give Mr. Miller

16  a minute or two, and then I have to move on because I have a

17  bunch of stuff to do and I have an afternoon calendar.

18          **MS. PRESS:**  Your Honor, I would just urge the Court

19  to take another look at the application.  What you're being

20  told here is it's okay --

21          **THE COURT:**  Got my own copy.

22          **MS. PRESS:**  Looks like you've looked at it quite a

23  bit.

24          We can't forget here that what we're talking about --

25  there's no question there are omissions.  Okay.  I think

1  defendants have to concede that.  They're omissions, right.

2  Says, Tell us about all the products.  They don't mention one

3  Beeche product.  Except on 2001, they mention something called

4  an access platform.

5        Where is the Beeche Crab?  That's not a platform.  No

6  one can stand on it.  Where's the Mecano Monorail, which is

7  also not a platform?

8        The reason I keep focusing on brochures is not

9  because the brochures in and of themselves are the tell-all

10 issue.  You have to look at it in conjunction with an

11 application where they clearly didn't provide the information

12 that they needed to, throwing out the phrase "access platforms"

13 without any other products, without any other information about

14 Beeche, without saying, We attach these things to rocket ships,

15 without saying, These are on highrise buildings.

16        These things are on the longest bridge in the world.

17 In fact, the evidence that we have put before you shows that

18 Beeche created -- no, I want to use the correct phrase, they

19 say, "We are the originator of engineered access systems."

20 Many of their advertisements say, "We are the leader in the

21 access and containment industry."

22        This is a significant business.  They're putting

23 these massive things on the sides of bridges, the longest

24 bridges in the world, the tallest buildings, the NASA rocket

25 ships, and they don't say a thing about it on the application.

And these are the products that they're seeking to insure.

It's not a case where the insured lied about smoking but then died from a car accident. That's not what happened here. These are the precise products being insured that they don't mention. No brochures. None of the advertisements. No reference. Go see the Web site. Nothing in writing, whatsoever.

And that's before you get to the other misrepresentations. We're just talking about the basic nature of the risk. They did not disclose it. They didn't give U.S. Risk any information that -- that would have put U.S. Risk on notice that they were not being truthful.

Remember, what they're telling you is: Our statements weren't true. We left stuff out. But you were on notice to go investigate.

Because they admit they had the Beeche Crab. And they admit they had the Mecano monorail. And they admit they had these roof outrigger products.

So they're admitting: No, we didn't tell you all the products. But because we gave you the phrase "access platforms" you should have known we were omitting things.

Right? That's what they're telling you.

**THE COURT:** You'll get your chance, Mr. Miller.

**MS. PRESS:** There's no duty of investigation. Nothing on that application created a duty of investigation.

1           I think this is, quite frankly, a really clear case.

2    We really tried to limit it to the most basic issue.  We didn't

3    bring up all the other issues in -- all the other

4    misrepresentations and omissions on the application.  We're

5    talking about the basic nature of the risk.  And they did not

6    provide all they knew, which is the requirement under the law.

7           **THE COURT:**  Mr. Miller.

8           **MR. MILLER:**  Uhm, I'm going to resist channeling my

9    client.  This is why they have pursued the bad faith case.  I

10   mean, the fact -- the argument --

11          **THE COURT:**  Don't you think they could have precluded

12   a lot of this if where it says, "Describe in detail the

13   products manufactured by your company"?  I know there's only

14   three lines, but they only use a line and a half.

15          **MR. MILLER:**  Okay.

16          **THE COURT:**  And there's not a single Beeche product,

17   from what I can tell, that's mentioned.

18          **MR. MILLER:**  Let me address that.

19          **THE COURT:**  A lot of concrete-related products

20   mentioned.  Bridge decks are mentioned.

21          As I understand it, these access platforms are

22   different from bridge decks.

23          **MR. MILLER:**  Yes, they are.  And let me, please, if I

24   could, address Counsel and your question, particularly

25   counsel's statement that we admit that we didn't tell them

1  anything about the Beeche products.

2          Engineered access is exclusively a Beeche product,

3  Your Honor.

4          **THE COURT:**  Engineered access is what you answered in

5  response to, "Describe your business" --

6          **MR. MILLER:**  In 1999, we said, okay, we told them

7  what our business was.  Our business included engineered

8  access.  That is a Beeche product.

9          **THE COURT:**  So if I understand what you're saying,

10  then, once you say "engineered access," you don't have to

11  answer anything about describing your products because you've

12  already told them what the nature of your company is?

13          **MR. MILLER:**  Your Honor, obviously, that's not --

14          **THE COURT:**  That gets us back to what I was telling

15  you earlier, about the way you read insurance code section,

16  which basically says, well, since they can figure everything

17  out, we don't really have to tell them much of anything.

18          **MR. MILLER:**  No, Your Honor.  In 2001 -- you put the

19  two of them together.  And in 2001 we said "access platforms."

20  You book end them.

21          In 1999, engineered access, Beeche product,

22  exclusively a Beeche product.  In 2001, access platforms,

23  another Beeche product.  Actually, the same product.  Different

24  way of saying the same thing.

25          We told them it was an engineered -- Your Honor, in

1  2001, the use of "access platform" appears not once, not simply

2  once on the first page of the application, where we had a

3  description of operations, but it does appear back on the third

4  page where Your Honor had the concern about the products.

5          On the 2001 application we said this three times.

6  Once in 1999, twice in 2001.  And, yet, they want to come to

7  court and say we didn't tell them one thing about the Beeche

8  product?

9          Yes, I'm exercised.  My client is exercised.  It

10 doesn't make any sense.

11         **THE COURT:**  All right.  This is an interesting case.

12 Let me just ask you a couple of questions logistically.  I'm

13 just trying to figure out when I'm going to get this ruling

14 out, because you obviously need to know whether you're

15 preparing for trial or not.

16         Remind me, when is the pretrial conference?

17         **MR. BALMAT:**  January 23rd, I believe.

18         **THE COURT:**  No, it can't be the 23rd.

19         **MS. PRESS:**  No.  I want to say --

20         **THE COURT:**  The 27th or February 3rd.

21         **MR. BALMAT:**  February 3rd.

22         **MS. PRESS:**  It's three weeks before --

23         (All parties talking simultaneously.)

24         **THE COURT:**  We start trial on the 23rd, right?

25         **MR. BALMAT:**  Yes.

1          **THE COURT:**  Okay.  So if it's the 3rd, your pretrial

2    papers are going to be sometime around the second week of

3    January.  So, okay, well, I will definitely -- I think I can

4    promise you this.  I'll give you, definitely, a ruling before

5    Christmas.

6          **MS. PRESS:**  Thank you, Your Honor.

7          **THE COURT:**  And if nothing else, it may just be a,

8    you know, one-liner motion granted/motion denied, opinion to

9    follow.  But I will try to get you a more reasoned ruling

10   before Christmas.

11         **MR. MILLER:**  A holiday gift.

12         **THE COURT:**  Well, all I'm simply saying is, if either

13   of you intend to start your vacation -- I mean, it's possible I

14   can get it out this week.  But I kind of doubt it.

15         **MR. MILLER:**  I'm fully electronically available.

16         **THE COURT:**  That's what I was just going to say.

17   Check your e-mail the beginning of next week.  That's possibly

18   a little more likely.

19         **MR. MILLER:**  Thank you, Your Honor.

20         **THE COURT:**  All right.  It's been very interesting

21   issues.  Sounds like some of these are sort of issues almost of

22   first impression.  And I don't know how the California courts

23   have managed to avoid dealing with them for so long.

24         **MS. PRESS:**  Your Honor, may I just -- the notice

25   asked for summary adjudication.  We've concentrated on the

1  2001, but I want to point out we also asked for adjudication of

2  2000.

3          Thank you.

4          **MR. MILLER:**  Your Honor, I don't -- I can argue that

5  until the cows come home.

6          **THE COURT:**  No.  I think I now know enough at least

7  to guide my ruling.

8          **MS. PRESS:**  Thank you for taking so much time.

9          **THE COURT:**  We're adjourned.

10         (At 12:11 p.m. the proceedings were adjourned.)

11                        -   -   -   -

12

13

14              **<u>CERTIFICATE OF REPORTER</u>**

15         I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  DATE:   Wednesday, December 24, 2008

19

                  s/b Katherine Powell Sullivan

20         _____

21        Katherine Powell Sullivan, CSR #5812, RPR, CRR
                     U.S. Court Reporter

22

23

24

25