UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIONAMERICA INSURANCE CO., LIMITED, Successor-in-interest to ST. PAUL REINSURANCE,<br><br>　　　　Plaintiff(s),<br><br>　v.<br><br>THE FORT MILLER GROUP, INC., THE FORT MILLER CO. and BEECHE SYSTEMS CORP.,<br>　　　　Defendant(s). | No. C05-1912 BZ<br><br>**FINDING OF FACT AND CONCLUSIONS OF LAW** |

Unionamerica Insurance Company ("Unionamerica") sued The Fort Miller Group, Inc. ("Fort Miller") and its former subsidiary Beeche Systems Corp. ("Beeche") to rescind the Commercial General Liability Gap Insurance policies ("CGL gap policies") it issued in 2000 and 2001 to Fort Miller.

The trial began on February 23, 2009. Having considered and weighed the undisputed facts and the evidence adduced at trial, and having assessed the credibility of the witnesses, I now make these findings of fact and conclusions of law as

required by Federal of Civil Procedure 52(a).[1]

**FINDINGS OF FACT**

1. Unionamerica, successor-in-interest to St. Paul Reinsurance Company Limited ("St. Paul"), is an insurance company organized under the laws of England and Wales and doing business in London, England.  St. Paul was an insurance company doing business in London at the time the insurance policies at issue originated.

2. Fort Miller Group, Inc. ("Fort Miller") is a holding company for several subsidiaries (including The Fort Miller Company, Inc.), which historically manufactured and sold products including pre-cast concrete, chain link fencing, and gates.  In 1998, Fort Miller purchased Beeche Systems, Inc. ("Beeche").

3. Beeche designed and sold access platforms and access platform systems.  These systems allow workers access to structures such as office buildings and bridges and were assembled at the project site, often by the client or someone hired by the client who had familiarity with assembling the systems.

4. Beeche manufactured many, but not all, of the components of the access platform systems that it designed and sold.  Access platform systems are comprised of individual modular component space frames and truss frames.  The components of these space frames and truss frames, which

---

[1] Pursuant to 28 U.S.C. 636(c), both parties have consented to my jurisdiction for all proceedings, including entry of final judgment.

2

1  include parts such as aluminum chords, nodes, and pins, are
2  combined with other component parts, such as plywood decks,
3  hoists, and wire rope.  Each system is unique and designed
4  for the particular job on which it is needed.

5      5.  At all relevant times, Fort Miller, assisted by an
6  insurance broker from Associates of Glens Falls, Inc.
7  ("AGF"), purchased CGL gap insurance to fill any gaps in
8  coverage created by exclusions in its CGL policies.

9      6.  U.S. Risk Underwriters, Inc. ("U.S. Risk") developed
10 CGL gap insurance prior to 1999.  U.S. Risk accepted and
11 underwrote the applications and then placed the insurance in
12 the London insurance market.  At U.S. Risk, CGL gap policies
13 were underwritten by Sandy Hoffman ("Hoffman") and her
14 immediate supervisor, Betty Prah ("Prah").  Both had many
15 years of underwriting experience.

16     7.  AGF is an insurance brokerage agency.  As of 1999,
17 it had handled Fort Miller's insurance needs for over 25
18 years.  Barbara Marshall ("Marshall"), who had many years of
19 experience in the insurance industry, was the principal AGF
20 employee involved in obtaining Fort Miller's CGL gap
21 insurance from U.S. Risk.  Marshall had worked on the Fort
22 Miller account since 1994 and was knowledgeable about its
23 business.

24     8.  About the same time that AGF was assisting Fort
25 Miller in applying for CGL gap insurance, it was also
26 assisting Fort Miller in obtaining or renewing other forms of
27 insurance, especially after Fort Miller acquired Beeche in
28 early 1998.  Marshall was involved in many of these efforts.

3

1  In almost all of these other insurance applications, AGF
2  either explicitly mentioned Beeche's products or directed the
3  insurer's attention to Beeche's website.  Many insurers
4  declined to provide insurance because of the risks they saw
5  associated with Beeche's products, especially with the
6  heights at which the products were used.
7       9.  In early March 1999, Marshall prepared a
8  preliminary, unsigned application ("preliminary application")
9  for a CGL gap policy on behalf of Fort Miller.  The
10 application was on a U.S. Risk form.  Because Marshall did
11 not have all of the necessary information to answer every
12 question on the preliminary application, she left some
13 questions blank.  On page two of the preliminary application,
14 Marshall listed all of Fort Miller's subsidiary companies,
15 including Beeche.  On this same page, Marshall identified
16 Beeche as one of the entities that Fort Miller sought to add
17 as a named insured on the CGL gap insurance, stating that
18 Beeche had its "own liability coverage" but that it was being
19 included on the application "for property [and] other
20 coverages."  Beeche's primary CGL carrier was not identified.
21      10.  On March 8, 1999, Marshall forwarded the
22 preliminary application to Hoffman, who underwrote the Fort
23 Miller account in 1999 and 2000.  The cover letter informed
24 Hoffman that the preliminary application was Fort Miller's
25 "first quote of this type for this coverage" and requested
26 that Hoffman review the application and advise AGF if there
27 was any additional information that Fort Miller needed to
28 submit.

1    11.  In response to a request on the application that
2 the applicant "attach any product brochures that [it] make[s]
3 available to customers", Marshall sent Hoffman brochures
4 describing Fort Miller's products.  The brochures found in
5 the U.S. Risk underwriting file included brochures about
6 several of Fort Miller's subsidiaries, including the Fort
7 Miller Company, Tymetal Corporation, and Duke Concrete
8 Products.  None of the brochures sent by Marshall to Hoffman
9 related to Beeche or its products.  Marshall also did not
10 list any of Beeche's products or operations in response to
11 questions for this information on the application.  Nothing
12 on the preliminary application referred U.S. Risk to Beeche's
13 website.  Marshall provided no satisfactory explanation for
14 these omissions.

15   12.  Information about the nature of Beeche's products
16 and the risks they presented was material to U.S. Risk and
17 the insurers it represented.  Had U.S. Risk known the true
18 nature of the risk, it might not have written the policy and
19 likely would have raised the premiums.  *See* California
20 Insurance Code § 334; <u>Old Line Life Ins. Co. v. Superior
21 Court</u>, 229 Cal. App. 3d 1600, 1604-06 (1991).

22   13.  Marshall also forwarded the preliminary application
23 to Richard Schumaker ("Schumaker"), Fort Miller's Chief
24 Financial Officer, for review.  Only the unsigned
25 application, not the brochures, were forwarded to Schumaker.

26   14.  On March 11, 1999, Hoffman faxed a memorandum to
27 Marshall asking for, among other things, the average and the
28 largest values of the products that Fort Miller manufactured,

5

1  questions left blank on the preliminary application.  After
2  consulting with Schumaker, Marshall answered that the average
3  value was less than $1,000 and that the largest value was
4  $100,000.

5      15.   Marshall testified that sometime in March 1999, she
6  and Hoffman spoke on the telephone.  Marshall testified that
7  Hoffman told her that she was experiencing difficulty
8  locating Fort Miller's products on its website and that she
9  had only been able to find information concerning "burial
10 vaults."  Marshall testified that she told Hoffman that Fort
11 Miller's subsidiaries had their own websites that listed
12 their respective products, and that each of these websites
13 could be accessed from the main Fort Miller website.

14     16.   Unionamerica introduced evidence that employees of
15 U.S. Risk's Dallas office, where Hoffman worked, did not have
16 the ability to browse the internet until around the summer of
17 2000.  The evidence included an "Internet Use Policy
18 Acknowledgment" form, signed by Hoffman, dated August 18,
19 2000.

20     17.   On April 1, 1999, U.S. Risk transmitted a premium
21 quote for CGL gap policy coverage to AGF and the policy was
22 bound based on the information contained in the preliminary
23 application, as supplemented by the answers to the specific
24 questions that Hoffman had asked Marshall.  At the request of
25 Fort Miller, the policy was issued effective April 9, 1999 to
26 April 9, 2000, so as to be consistent with the expiration
27 dates of Fort Miller's other insurance policies.  U.S. Risk
28 placed the policy with non-party CNA Reinsurance Company

6

1  Limited.

2      18.  In May 1999, after making several changes to the
3  preliminary application, including adding the term
4  "engineered access" to the description of Fort Miller's
5  business, Schumaker signed the application.  "Engineered
6  access" is a term, coined by Beeche, which refers not only to
7  Beeche's products, but also to the bundle of related services
8  it provides, including the design, engineering, and
9  maintenance of access platform systems.

10      19.  The signed application was forwarded by Marshall to
11  Hoffman on or about June 8, 1999.  Marshall alerted Hoffman
12  to some of the changes in the application that Schumaker had
13  made, but did not mention that the term "engineered access"
14  had been added.

15      20.  On March 17, 2000, Marshall wrote Hoffman
16  requesting renewal.  On March 28, 2000, Hoffman sent a memo
17  to Marshall attaching a renewal quote.  The 2000 application
18  is identical to the preliminary, unsigned 1999 CGL gap
19  insurance policy application originally forwarded by Marshall
20  to Hoffman.

21      21.  Thereafter, U.S. Risk issued a renewal of Fort
22  Miller's CGL gap insurance policy, Policy No. USG10162,
23  effective from April 9, 2000 to April 9, 2001.  This policy
24  was placed with St. Paul.

25      22.  In January 2001, Marshall wrote U.S. Risk and
26  requested a second renewal.  She asked U.S. Risk to send any
27  "necessary forms if needed for renewal pricing."  By then,
28  Hoffman no longer worked for U.S. Risk, and Prah became the

1  underwriter for the third policy.  Hoffman died shortly
2  thereafter.
3      23.  On January 26, 2001, Prah wrote Marshall that Fort
4  Miller's CGL gap policy was "due to expire within 60 days."
5  The letter stated that if there were any changes "during the
6  policy year or during renewal" U.S. Risk would require a
7  renewal CGL gap policy application, but if there were no
8  changes, U.S. Risk would offer a quote "based on the expiring
9  information."
10     24.  On January 30, 2001, Marshall sent a memo to Prah
11 stating: "There are no changes in exposures etc. Please quote
12 based on expiring and we will secure renewal application for
13 binding purposes."  This meant that AGF was representing to
14 U.S. Risk that there had been no material changes in the risk
15 from the prior applications.
16     25.  Based on this representation, Prah reviewed the
17 2001 application under the assumption that the products that
18 Fort Miller sought to insure were the same products that it
19 had listed on its prior applications, and underwrote the risk
20 by "zero[ing] in" on the values listed in the application in
21 order to quote a renewal premium.
22     26.  On February 8, 2001, Marshall forwarded a signed
23 renewal application to Prah.  In the 2001 application, Fort
24 Miller added the term "access platforms" to the list of Fort
25 Miller's products and to the description of its operations,
26 and deleted the term "engineered access."  In response to the
27 request on the application that copies of company or product
28 brochures or advertising material be provided, Marshall

8

stated "see your prior file since 4/99." The remainder of the 2001 application was substantially similar to the application submitted in 1999.

27. Thereafter, U.S. Risk issued a third CGL gap insurance policy on St. Paul paper to Fort Miller and its subsidiaries, Policy No. USG10440, effective April 9, 2001 to April 9, 2002.

28. Each of the three policies provided coverage for "Damage to Your Product" and "Damage to Impaired Property or Property Not Physically Injured."

29. In December of 1999, Beeche sold to Robison-Prezioso, Inc. ("RPI") and California Engineering Contractors/MCC ("CEC/MCC") several access systems for use on the San Francisco/Oakland Bay Bridge.

30. On January 4, 2002, an accident occurred on the Bay Bridge involving a Beeche access system product, causing damage to the access system itself, injuries to one or more individuals, and delays in completion of the project.

31. On March 27, 2002, Vida Clemmons and other plaintiffs filed personal injury lawsuits against Fort Miller, Beeche, and others for injuries sustained as a result of the January 4, 2002 accident.

32. On December 1, 2003, RPI sued Fort Miller, Beeche, and others ("the RPI Suit"), alleging, among other things, that RPI suffered damages because the access systems were defective and caused delay.

33. On January 20, 2004, CEC/MCC filed suit against Fort Miller, Beeche, and others ("the CEC/MCC Suit"),

9

1  alleging, among other things, that CEC/MCC suffered damages
2  because the access systems were defective and caused delay.
3     34.  The parties to the RPI Suit and the CEC/MCC Suit
4  reached a settlement of all claims in those actions through
5  contributions of various insurance carriers.  St. Paul agreed
6  to pay (and did pay) $671,000 under a reservation of its
7  rights to rescind the policies and to seek reimbursement for
8  amounts paid under the policies.
9     35.  The parties have stipulated, for the purpose of
10 this trial only, that the defense fees and costs and
11 indemnity amounts paid by Unionamerica in defending the
12 underlying actions were reasonable and necessary and that
13 should Unionamerica prevail on its claims for rescission, it
14 shall be entitled to reimbursement in the amount of
15 $1,548,292.32.

**CONCLUSIONS OF LAW**

17    1.  This court has subject matter jurisdiction pursuant
18 to 28 U.S.C. § 1332(a).
19    2.  In a diversity action that involves interpretation
20 of an insurance contract, California law governs.  Conestoga
21 Servs. Corp. v. Executive Risk Indem., Inc., 312 F.3d 976,
22 981 (9th Cir. 2002).
23    3.  In California, a material misrepresentation or
24 concealment in an insurance application, whether intentional
25 or unintentional, is grounds to seek rescission.  California
26 Insurance Code § 331.  *See also* West Coast Life Ins. Co. v.
27 Ward, 132 Cal.App.4th 181, 187 (2005) (citing Imperial
28 Casualty & Indemnity Co. v. Sogomonian, 198 Cal.App.3d 169,

1  179-180 (1988)).

2       4.   Under California Insurance Code § 334, "materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."  In California, the insurer must demonstrate that, had the true facts been disclosed, it would have caused the insurer's underwriters to reject the application or accept it only under different terms.  Old Line Life Ins. Co., 229 Cal.App.3d at 1604-06.  Accordingly, California courts have applied a "subjective" standard to the test for materiality in the sense that "the critical question is the effect truthful answers would have had on [the particular insurer], not on some 'average reasonable' insurer." Sogomonian, 198 Cal.App.3d at 181.

     5.   Fort Miller, through AGF, failed to adequately disclose the true nature of Beeche's products when it failed to describe Beeche's products in its preliminary application and failed to provide any brochures about Beeche to U.S. Risk.  Beeche's products are sufficiently different from many of Fort Miller's other products, such that information about them was material to the risk that Fort Miller was asking the insurer to assume.  Adding the words "engineered access" to the signed version of the 1999 application more than a month after the policy had been rated and bound, without alerting U.S. Risk to these changes, did not fully discharge Fort Miller's duty of disclosure under California law, including

11

1  California Insurance Code § 332.

2      6.  Fort Miller argues a variety of theories, including
waiver and estoppel, to support several contentions, such as
its contention that the failure to provide U.S. Risk with
Beeche brochures or other adequate information about Beeche's
products, was in effect cured when Marshall directed Hoffman
to Beeche's website.  After weighing all the evidence before
me, including the credibility of the witnesses, I conclude
that Fort Miller has not established any of these defenses.
Among other things, there is no evidence that Hoffman
actually looked at the Beeche website and, given what she
would have learned about Beeche's products had she accessed
its website, it is not reasonable to infer that she would
have done nothing with the information she would have
learned.

    7.  Unionamerica has raised many other grounds for
rescission; however, many of its contentions arise from
ambiguities inherent in the policy application, such as the
meaning of the words "manufacture", "value", and "sell",
which are construed against it.  (*See* Order Denying P.'s Mot.
for Summary Judgment pp.9-10.)  In view of the disposition
reached in these findings and conclusions, I do not reach
these other arguments, which Fort Miller contends are
illustrative of what has come to be known as postclaim
underwriting.  *See, e.g.*, California Health & Safety Code §
1389.3; <u>Hailey v. California Physicians' Service</u>, 158
Cal.App.4th 452, 465 (2007); <u>Post Claim Underwriting</u>, 102 W.
Va. L. Rev. 809, 818-19 (2000).

1   8.  In effect, Fort Miller argues that Unionamerica and U.S. Risk were willing to place the policies and accept its premiums without doing the same sort of underwriting that Fort Miller's other insurers did.  This is why, Fort Miller claims, the CGL Gap Program proved a financial failure.  To bail themselves out, U.S. Risk and Unionamerica decided to act as follows: if no claims were filed against the policy, they kept the premiums; if a claim was filed, they engaged in a thorough review of the file, found a myriad of failures by the insured to "tell all it knows" about the risk in its application, which could have been resolved if the application had been properly underwritten at the outset, and then sought to rescind the policy.[2]

9.  There are at least two flaws in Fort Miller's arguments.  First, it is not clear this is what Unionamerica and U.S. Risk did.  While virtually no evidence was presented about the extent of U.S. Risk's underwriting of any of the three applications, save for calculating a premium, this is in part because Hoffman, the initial underwriter on the Fort Miller account, died before this dispute arose.  Fort Miller's reliance on Prah's testimony to support its argument that U.S. Risk did not care "one whit" about the products it was insuring, is not persuasive.  While Prah testified that "the main thing" she focused on when reviewing the 2001 application were the values of the products, she also

---

[2] These allegations form part of Fort Miller's bad faith counterclaim, which the Court has stayed pending resolution of the rescission claim.

1   testified that she "looked at everything on the application"
2   and that "everything on [the application was] important."
3   Significantly, when Prah underwrote the policy in 2001, the
4   coverage had been in place for two years.  Prah was asked by
5   Marshall to quote a renewal price for a risk that had not
6   changed.  Understandably, Prah's focus was on generating a
7   premium quotation, not on reviewing the listed products to
8   assess the level of risk they presented.

9       10.  More importantly, exercising diversity
10  jurisdiction, this Court is bound by California law and the
11  decisions of its courts.  Thus far, postclaim underwriting
12  has been prohibited only in the context of some automobile
13  insurance[3], and health insurance.[4]  California courts have
14  been hesitant to extend this prohibition to other areas of
15  insurance.[5]

16      11.  No recent California case has explored the duties
17  of the insured and the insurer in the context of a brief,
18  generalized application for commercial insurance directed to
19  a large corporation with many subsidiaries and hundreds of
20  products.  As articulated by Unionamerica, the insured has
21  the obligation to "tell all it knows" about the risk, *see*

---

[3] *See, e.g.*, Barrera v. State Farm Mut. Auto. Ins. Co., 71 Cal.2d 659 (1969); United Servs. Auto Assoc. v. Pegos, 107 Cal.App.4th 392, 394-5 (2003).

[4] *See, e.g.*, California Health & Safety Code § 1389.3; Hailey v. California Physicians' Service, 158 Cal.App.4th 452, 471 (2007).

[5] *See, e.g.*, Philadelphia Indemnity Ins. Co. v. Montes-Harris, 40 Cal.4th 151 (2006)(excess rental car liability insurance); Firemans Fund v. Superior Ct., 75 Cal.App.3d 627 (1977)(aircraft liability insurance).

14

Thompson v. Occidental Life Ins. Co., 9 Cal.3d 904, 915 (1973), while the insurer has no obligation to investigate the accuracy or completeness of any of the information on the application. *See* Mitchell v. United Nat'l Ins. Co., 127 Cal.App.4th 457, 477 (2005). In response, Fort Miller argues that its duty to tell "all it knew" is modified by various sections of the California Insurance Code. For example, Fort Miller claims that since U.S. Risk had the "means of ascertaining" information about Beeche's products through an internet search, under California Insurance Code § 332, Fort Miller was relieved of its duty to produce Beeche's brochures, describe its products, or provide its website.[6] Fort Miller also argues that its failure to include any Beeche brochures should have put U.S. Risk on notice of its omission and triggered a duty to inquire. However, Fort Miller did not include brochures for a number of its companies, which apparently were inactive, and there was nothing in the preliminary application to alert Hoffman that she should inquire about Beeche. The few courts that have interpreted section 332 have not interpreted it to impose on the insurer an affirmative duty to investigate that overrides the insured's duty of disclosure.[7] *See, e.g.*, Lunardi v.

---

[6] "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." Cal. Ins. Code § 332

[7] While there may be certain circumstances that trigger a duty of investigation on the part of the insurer, based on the evidence presented in this case, none of those circumstances or triggering events occurred. *See, e.g.*,

15

1   Great-West Life Assurance Co., 37 Cal.App.4th 807, 826 (1995)
2   ("[s]ection 332 does not require the insurer to take all
3   possible measures to reveal undisclosed conditions."); Mirich
4   v. Underwriters at Lloyd's London, 64 Cal.App.2d 522, 531
5   (1944) (the fact that the insurer had the means of
6   ascertaining information regarding the insured's past claims
7   by looking at court records did not excuse the insured from
8   disclosing the material information).  Fort Miller's
9   interprets § 332 too broadly, since requiring an insurer
10  routinely to search the internet for information about an
11  applicant could undermine the application process and the
12  applicant's duties and could raise the cost of obtaining
13  insurance.  See Barrera v. State Farm Mut. Auto. Ins. Co. 71
14  Cal.2d 659, 682 (1969).  Whether the current interpretation
15  of § 332 is wise is for the California courts to decide.

16      12.  Here, because the nature of Beeche's business was
17  significantly different from that of Fort Miller's and its
18  other subsidiary companies, and because the application
19  submitted by Fort Miller did not contain a sufficient
20  description of Beeche's business or its products or attach
21  any Beeche brochures despite a specific request for them, I
22  conclude that there was a material misrepresentation and/or
23  concealment that entitles Unionamerica to rescind.

---

DiPasqua v. Cal. W. States Life Ins. Co., 106 Cal.App.2d 281, 284-85 (1951) (The life insurer could not rely solely on insured's answers in his application where it had obtained an investigation report from a third party that revealed that the insured's answer to a material question was untrue.); Merchants Fire Assurance Corp. v. Lattimore, 263 F.2d 232, 242-44 (9th Cir. 1959).

16

1    For the foregoing reasons, Unionamerica is entitled to rescission of the 2000 and 2001 CGL gap policies and to reimbursement in the amount $1,548,292.32.

Dated: March 16, 2009

*[signature]*
Bernard Zimmerman
United States Magistrate Judge

G:\BZALL\-BZCASES\UNIONAMERICA V. FORT MILLER\TRIAL\FINDINGS OF FACT AND CONCLUSIONS OF LAW ORDER.v10.BZ 2 VERSION.wpd